FIRST DIVISION
SEPTEMBER 10, 2007

No. 1-05-1141

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from the
                                        )    Circuit Court of
        Plaintiff-Appellee,             )    Cook County.
                                        )
    v.                                  )    No. 04 CR 7437
                                        )
PAUL WILLIAMS,                          )    The Honorable
                                        )    Stuart E. Palmer,
        Defendant-Appellant.            )    Judge Presiding.


        JUSTICE GARCIA delivered the opinion of the court.

        Following a bench trial, the defendant, Paul Williams, was

convicted of two counts of unlawful use of recorded sounds or

images in violation of section 16-7(a)(2) of the Criminal Code of

1961 (the Code) (720 ILCS 5/16-7(a)(2) (West 2004)), and two

counts of unlawful use of unidentified sound or audio visual

recordings in violation of section 16-8 of the Code (720 ILCS

5/16-8 (West 2004)).  He was sentenced to two years' probation

and 60 days' time served in the Cook County jail and was assessed

costs and fines.

        The defendant contends on appeal that: (1) all four of his

convictions are null and void because the federal Copyright Act

of 1976 (17 U.S.C. §101 et seq. (2000)) preempts the State's

regulation of his activities in this case; (2) section 16-8 of the Code violates the due process clauses of the Illinois and United States Constitutions; and (3) the evidence was insufficient to prove his guilt beyond a reasonable doubt.

BACKGROUND

It was established at trial that after midnight on March 10, 2004, the defendant entered the Bubble Land laundromat at 5101 South Western Avenue in Chicago, where Valerie Herrera was working as an attendant. Herrera testified the defendant attempted to sell compact discs (CDs) for $5 and digital video discs (DVDs) for $10 from a black suitcase while inside and outside the laundromat. Herrera notified the police by activating the laundromat's panic button.

Chicago police officer Tracy Hoover responded to the call and testified that she and her partner parked their squad car near the laundromat in an attempt to observe any transactions of the defendant. During this surveillance, lasting approximately 10 minutes, Hoover observed two transactions where the defendant and an individual exchanged money for what appeared to be CDs. She could not see the titles.

Officer Hoover and her partner approached the defendant, questioned him, and learned that he did not have a permit to sell merchandise. Hoover estimated that there were between 250 and

300 CDs and DVDs, which she perceived to be "fake," in the defendant's suitcase.  She recognized one DVD as that of the movie "The Passion of the Christ," which was playing in movie theaters at the time.  She recognized certain CDs as those of "rap artists."  The CDs lacked the colorings that CDs purchased from a store would have.  Although the defendant's CDs were wrapped in plastic, they were not heat-sealed and did not have security tape on them.  Hoover arrested the defendant and inventoried the suitcase with the DVDs and CDs inside.  At trial, Hoover identified People's Group Exhibits 1-A through 1-C as photocopies of photographs of CDs or DVDs the defendant had in his possession.[1]

J. Martin Walsh, a former postal inspector and the current supervisor of investigations for the Recording Industry Association of America (RIAA), also testified at trial.  At approximately 11 a.m. on March 10, 2004, Walsh went to the Ninth District police station, where he was shown a black suitcase containing approximately 200 CDs.  Walsh examined, "picked up" and "looked" at, 10 to 20 of them.  Defense counsel stipulated that Walsh was "an expert in determining counterfeit DVDs [and] CDs."

---

[1] The exhibits are not in the record.

No. 1-05-1141

Walsh discussed three types of CD piracy: (1) counterfeits; (2) piratical mixes; and (3) bootlegs.[2]  A "counterfeit CD" results where an existing CD and the artwork from its covers are duplicated.  A "piratical mix" results where songs are taken from different artists and put together as a compilation or "mix."  A "bootleg" is an unauthorized recording of a live concert.

According to Walsh, the discs he examined in the suitcase were not actually CDs but instead were "compact disc recordables" or "CDRs."  Walsh looked to several factors in order to determine whether they were counterfeits or pirates.  First, while all "legitimate" music is manufactured and distributed on pressed and molded CDs, "illegal" music is "burned" onto CDRs.  Second, while CDs are manufactured at plants and contain artwork on their covers, the defendant's CDRs contained photocopies of the covers, which appeared faded and improperly cut.  Third, the defendant's CDRs did not have "the true name and address of the manufacturer displayed on the cover."  Fourth, while the center ring of CDs has a "SID code," consisting of an "IFPI number" identifying the plant where the CD was manufactured and a second IFPI number identifying the master copy from which the CD was made, the

---

[2] A fourth type of piracy involves music downloaded from the Internet.

**4**

defendant's CDRs omitted this information.  Fifth, while the underside of a "legitimate" CD is silver, the underside of the discs the defendant possessed had a bluish-green tint, indicating they were CDRs.

According to Walsh, it is important to determine when looking at a compilation disc whether any work of the "five major labels" -- Universal, Sony, EMI, BMG, and Time-Warner -- is included.  According to Walsh, the five major labels covered approximately 90% of the recording industry.  The remaining 10% are considered "independent" and are free to manufacture, distribute, and sell their product "in any format and in any arena."  However, if a CDR contains 15 songs and one of them is covered by a major label, the entire disc is illegal.  The following also transpired on direct examination.

"Q.  Okay.  When -- Did you have an opportunity to examine on March 10, 2004, any compilation disks?

A.  Yes. I did.

Q.  When you examined the compilation disks, with regard to your determination of whether or not it was a pirate, what did you decide after looking at them?

A.  Yes.  Those were also illegal

copies. They were CDRs, and they contained
songs by artists that were covered by the
five major labels and clearly were not
authorized for this distribution."

Walsh also testified that while at the station, he examined one CDR entitled "It's Too Short." The photocopied advertisement label contained the trademark for Jive Records, a sublabel of an RIAA major label. The disc lacked the identifying marks of a legitimate CD. This indicated to Walsh that the CDR was "illegally manufactured and [was] being distributed without at the very least the proper labeling and certainly without the consent of the licensee." Walsh identified People's Group Exhibit 1-A as a photocopy of the disc and a photocopy of the front and back covers of the recovered disc.

Walsh identified the second page of People's Group Exhibit 1-A as a photocopy of a CDR entitled "Too Short 2 B Married 2 Da Game," also released on Jive Records. Walsh identified the disc as a CDR because it contained the trademark for Hewlett-Packard, a CDR manufacturer. The disc lacked any identifying markings in its inner ring. In Walsh's opinion, the discs contained in People's Group Exhibit 1-A were "counterfeit," "burned" copies.

Walsh identified page one of People's Group Exhibit 1-B as a photocopy of the front and back covers of a disc entitled "Blood

**6**

in My Eye" by the artist Ja Rule, who is covered by one of the labels the RIAA represents. Page two of the exhibit was a photocopy of the actual disc, which was a CDR. In Walsh's opinion, the disc contained in People's Group Exhibit 1-B was a "counterfeit," "burned" copy.

Walsh identified People's Exhibit 1-C as a photocopy of the back cover and CDR of a compilation of music by different artists. Walsh determined that it was a pirated copy and that at least five of the artists, including Ludacris and R. Kelly, were covered by one of the major labels. In Walsh's opinion, the disc contained in People's Exhibit 1-C was a "burned copy" and "a mix of various artists" that was "piratical." According to Walsh, none of the 10 to 20 discs that he examined on March 10, 2004, were made with consent of the recording industry. Walsh was not asked, and did not testify, about whether he listened to any of the discs.

Walsh testified on cross-examination that he did not look at all of the CDs in the defendant's suitcase, but viewed only a sampling. Walsh also acknowledged that some CDRs, in certain circumstances, are "legal." He additionally stated that although he noticed that the suitcase contained DVDs, he "didn't look at those." He also stated that he did not represent the Motion Picture Association of America (MPAA).

**7**

The defendant moved for a directed finding of not guilty on counts II and IV, charging the lack of consent on the part of the MPAA, arguing that the State failed to present any testimony on behalf of the MPAA. The trial court found Officer Hoover's testimony that she saw a DVD entitled "The Passion of the Christ," which was still in theaters, sufficient to prove lack of consent and denied the motion.

The defense rested. In his closing argument, defense counsel distinguished this case from a case involving a controlled substance, arguing that although it is a crime in Illinois to possess a controlled substance, with or without the intent to sell, the statutes the defendant was charged with violating only prohibited the intentional or knowing sale or offering for sale of unauthorized or unidentified DVDs or CDs. Mere possession of such DVDs or CDs was not a crime. Defense counsel continued:

> "Now the expert in this case has
> testified that some CDRs are legal, and also
> more importantly, judge, he didn't examine
> the entire suitcase. There were some [200]
> to 300 DVDs and CDs in that suitcase. He
> looked at a sampling of them, and some of
> them were bootleg. We don't contest that,

**8**

but possession of bootleg items is not a crime.

And it's the State's responsibility, it's their duty to prove beyond a reasonable doubt that this defendant knowingly offered for sale bootleg movies.

And since no one in this case saw or heard any of the titles that were allegedly offered for sale or sold and since the expert in this case didn't examine the entire thing to see if, perhaps, there were legal movies in there, the State has not met their burden of proving that this defendant offered for sale sounds recorded.

All they've proven, judge, is that he had some in his possession. Again I reiterate possession is not a crime."

Defense counsel also argued the State failed to prove the defendant knew the items in the suitcase "were bootleg," arguing that the defendant was a street seller without the expertise of a representative from the RIAA. The court rejected these arguments and found the defendant guilty of all four counts. The defendant was sentenced as indicated above, and this timely appeal

No. 1-05-1141

followed.

ANALYSIS

At issue are sections 16-7 and 16-8 of the Code.  Section 16-7, entitled "Unlawful use of recorded sounds or images," in relevant part, states:

> "(a) A person commits unlawful use of recorded sounds or images when he:
>
> (1) Intentionally, knowingly or recklessly transfers or causes to be transferred without the consent of the owner, any sounds or images recorded on any sound or audio visual recording with the purpose of selling or causing to be sold, or using or causing to be used for profit the article to which such sounds or recordings of sound are transferred.
>
> (2) Intentionally, knowingly or recklessly sells, offers for sale, advertises for sale, uses or causes to be used for profit any such article described in subsection 16-7(a)(1) without consent of the owner."  720 ILCS 5/16-7(a)(1), (a)(2) (West 2004).

**10**

No. 1-05-1141

Section 16-8, entitled "Unlawful use of unidentified sound or audio visual recordings," in relevant part, states:

> "(a) A person commits unlawful use of unidentified sound or audio visual recordings when he intentionally, knowingly, recklessly or negligently for profit manufactures, sells, distributes, vends, circulates, performs, leases or otherwise deals in and with unidentified sound or audio visual recordings or causes the manufacture, sale, distribution, vending, circulation, performance, lease or other dealing in and with unidentified sound or audio visual recordings." 720 ILCS 5/16-8(a) (West 2004).

Section 16-7(b) sets forth definitions of the various terms used in sections 16-7 and 16-8. "Owner" is defined as "the person who owns the master sound recording on which sound is recorded and from which the transferred recorded sounds are directly or indirectly derived." 720 ILCS 5/16-7(b)(2) (West 2004). "Sound or audio visual recording" is defined as "any sound or audio visual phonograph record, disc, pre-recorded tape, film, wire, magnetic tape or other object, device or medium, now known or hereafter invented, by which sounds or images may be

**11**

reproduced with or without the use of any additional machine, equipment or device."  720 ILCS 5/16-7(b)(3) (West 2004). "Master sound recording" is defined as "the original physical object on which a given set of sounds were first recorded and which the original object from which all subsequent sound recordings embodying the same set of sounds are directly or indirectly derived."  720 ILCS 5/16-7(b)(4) (West 2004). "Unidentified sound or audio visual recording" is defined as "a sound or audio visual recording without the actual name and full and correct street address of the manufacturer, and the name of the actual performers or groups prominently and legibly printed on the outside cover or jacket and on the label of such sound or audio visual recording."  720 ILCS 5/16-7(b)(5) (West 2004). "Manufacturer" is defined as "the person who actually makes or causes to be made a sound or audio visual recording."  720 ILCS 5/16-7(b)(6) (West 2004).  An affirmative defense to any charge of unlawful use of recorded sounds or images exists where the sounds or images are "public domain material."  720 ILCS 5/16-7(i) (West 2004).

In addition to challenging the sufficiency of the evidence to support his convictions, the defendant argues his convictions for violating sections 16-7 and 16-8 are preempted by federal copyright law and that section 16-8 violates due process.  Our

**12**

supreme court has instructed that "cases should be decided on nonc
onstitutional grounds whenever possible" and that courts should "reach[] constitutional issues only as a last resort." In re E.H., 224 Ill. 2d 172, 178, 863 N.E.2d 231 (2006). Consequently, the defendant's contention that the evidence was insufficient to prove his guilt beyond a reasonable doubt on all counts is addressed first.

I.   Sufficiency of the Evidence

The defendant attacks the sufficiency of the evidence to support his convictions in two ways.  First, the defendant argues that all four of his convictions must be reversed because the State failed to prove the items in the suitcase actually contained sound or audio visual recordings.  Second, the defendant contends that one of his convictions for violating section 16-7 (count II) must be reversed because the State failed to prove that he acted without consent of the MPAA.

When a defendant challenges the sufficiency of the evidence, the issue is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  People v. Hagberg, 192 Ill. 2d 29, 33-34, 733 N.E.2d 1271 (2000); People v. Collins, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).  When applying this standard, a reviewing

**13**

court must construe all reasonable inferences from the evidence in favor of the prosecution, regardless of the nature of the evidence. People v. Bush, 214 Ill. 2d 318, 326, 827 N.E.2d 455 (2005).

Counts I and II of the information alleged the defendant committed the offense of unlawful use of recorded sounds or images (720 ILCS 5/16-7(a)(2) (West 2004)). Count I alleged the defendant "intentionally or knowingly offered for sale any sounds or images recorded on any sound or audio visual recording, to wit: compact disc's [sic], without the consent of the owner to wit: [the RIAA]." Count II alleged the same elements with regard to DVDs but without consent of the MPAA.

Counts III and IV of the information alleged the defendant committed the offense of unlawful use of unidentified sound or audio visual recordings (720 ILCS 5/16-8 (West 2004)). Count III alleged the defendant "intentionally or knowingly for profit manufactured, sold, distributed, vended, circulated, performed, leased or otherwise dealt in and with unidentified sound or audio visual recordings, to wit: compact discs, without the consent of the [RIAA]." Count IV alleged the same elements with regard to "Compact Discs" without consent of the MPAA.[3]

---

[3] The parties do not address the scrivener's error of the

The defendant first argues that all four of his convictions must be reversed because the State failed to introduce any evidence to prove that the discs he possessed actually contained any recorded sounds or audio visuals. The defendant asserts that although expert J. Martin Walsh testified he examined 10 to 20 CDRs, he never stated that he listened to any of them and offered no testimony concerning the DVDs. The defendant also points out that none of the CDRs or DVDs were played for the court or even introduced at trial. Rather, the State introduced only photocopies of the covers of the CDs and photocopies of the CDs themselves. No tangible evidence was introduced regarding the DVDs. The defendant analogizes this case to controlled substance cases, such as Hagberg, 192 Ill. 2d at 34, and People v. Armstrong, 65 Ill. App. 3d 680, 685, 382 N.E.2d 121 (1978), which hold that the State must prove that the substance the defendant is convicted of possessing or delivering is in fact a controlled substance. The defendant contends that the State in this case failed to prove the corpus delicti of the offense -- that actual recordings were present on the discs.[4]

_____

use of "Compact Discs," rather than "Digital Video Discs," in count IV.

[4] The defendant acknowledges that "[w]hile the sale of blank

**15**

To support its theory that the evidence was sufficient, the State primarily relies on Herrera's testimony establishing that the defendant was offering to sell CDs and DVDs to customers of the laundromat and Walsh's testimony establishing that he examined 10 to 20 discs and concluded they "contained songs by artists that were covered by the five major labels." At oral argument, the State contended that the cumulative impact of this circumstantial evidence, along with defense counsel's concession during closing argument that the defendant's items were "bootleg," was sufficient to prove the defendant's guilt beyond a reasonable doubt.

Walsh, a conceded expert in determining counterfeit CDs, testified that the defendant's CDs were actually CDRs that "contained songs by artists that were covered by the five major labels." It is not clear from Walsh's testimony whether his conclusion that the CDRs "contained songs" rests solely on his physical examination of the discs, as the defendant argues, or whether he actually listened to the recorded sound itself.

---

discs which purport to be sound or audio visual recordings may subject an individual to criminal liability under another statute, it would not subject an individual to criminal liability under either of the statutes in question here."

No. 1-05-1141

Walsh's testimony supports either inference. As a reviewing court, we must consider the evidence in the light most favorable to the State and allow all reasonable inferences in its favor. Bush, 214 Ill. 2d at 326. With this view of the evidence in mind, we need only determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) Bush, 214 Ill. 2d at 326, quoting Jackson v. Virginia, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979).

The State's evidence established seven incriminating facts: (1) the defendant represented to customers of the laundromat that the CDs and DVDs he was offering for sale contained music, i.e., sounds, or movies, i.e., audio visuals; (2) one CD purported to be a copy of "Too Short 2 B Married 2 Da Game," another purported to be a copy of "Blood in My Eye" by Ja Rule, and one listed artists such as Ludacris and R. Kelly; (3) 10 to 20 of his CDs were examined by Walsh, an expert in determining counterfeit CDs; (4) the examined CDs were not in fact CDs, but instead were CDRs; (5) at least one examined CDR purportedly "contained songs by artists that were covered by the five major labels"; (6) none of the examined CDRs were made with the consent of the recording industry; and (7) the examined CDRs were without the proper listing of the actual manufacturer, i.e., the transferor.

**17**

Defense counsel did not dispute that the State proved the existence of recorded sounds in his closing argument, and even stated that "some of them were bootleg. We don't contest that," and conceded that the State proved the defendant "had some [recorded sounds] in his possession." Additionally, the medium in the possession of the defendant -- recordable CDs -- supports the inference that the discs contained sound recordings. This evidence, when considered in the light most favorable to the State, and in the course of common reasoning and logic, was sufficient to support the existence of sound recordings. We therefore conclude the State proved that the CDs the defendant possessed contained sound recordings as alleged and that the evidence was sufficient to support the defendant's convictions under counts I and III of the information in that the defendant knowingly offered for sale recorded sounds on discs without consent of the RIAA and the recorded sounds were "unidentified" as the actual name of the manufacturer was not the manufacturer listed on the covers.

The State, however failed to prove that the DVDs in the possession of the defendant contained recorded images. Significantly, Walsh did not examine any of the defendant's DVDs and offered no testimony concerning their appearance or whether he believed they were counterfeit. Officer Hoover's testimony

**18**

that she saw a DVD in the defendant's suitcase of "The Passion of the Christ," without any further description of the appearance of the actual DVD, amounts to no more than a description of what may have been the photocopied advertisement cover. Walsh and Officer Hoover identified each of the exhibits introduced by the State as having photocopied covers, identifying the CDs within. This appears to be the method of packaging for the CDs. No evidence was introduced that the packaging for the DVDs was any different. Unlike the CDs, no exhibit regarding any of the DVDs was presented to the trial court. Based on Officer Hoover's single ambiguous statement that she observed a DVD among the CDs, there is even a question whether an actual DVD was present inside the DVD packaging and on which was actually recorded the Mel Gibson film. The fact finder was given no other evidence from which to infer this element. Walsh, as a stipulated expert on both counterfeit CDs and DVDs, provided no testimony as to identifying counterfeit DVDs as he did for CDs. In fact, the substantial evidence introduced regarding the CDs makes pale by comparison the evidence supporting the defendant's convictions as to the DVDs. We decline to uphold the defendant's convictions regarding the MPAA without additional evidence. We conclude the evidence was insufficient to support the defendant's convictions under counts II and IV.

No. 1-05-1141

## II. Preemption Claim

We next address whether the defendant's remaining convictions for violating sections 16-7(a)(2) (count I) and 16-8 (count III) of the Code are null and void because the federal Copyright Act preempts the State's regulation of his activities in this case.[5] Contrary to the State's argument, the defendant's failure to raise this issue in the trial court does not render his contention forfeited, as "[a]n argument that an order or judgment is void is not subject to waiver." People v. Thompson, 209 Ill. 2d 19, 27, 864 N.E.2d 758 (2004); see also People v. Mata, 217 Ill. 2d 535, 546, 842 N.E.2d 686 (2005) (state law is "without effect" if preempted by federal law).

---

[5] Because the issue was not presented, we do not consider whether count III under section 16-8 is an included offense of count I under section 16-7(a)(2). See People v. Zakarian, 121 Ill. App. 3d 968, 976, 460 N.E.2d 422 (1984) ("we find that section 16-8, unlawful use of unidentified sound recordings, is an included offense of section 16-7(a)(2)"), overruled on other grounds, People v. Perry, 224 Ill. 2d 312, 864 N.E.2d 196 (2007). Nor do we consider the significance of the additional burden assumed by the State in count III that the unlawful use occurred "without the consent of the [RIAA]."

No. 1-05-1141

Whether state law is preempted by federal statute is a question of law reviewed de novo. Kinkel v. Cingular Wireless, LLC, 223 Ill. 2d 1, 15, 857 N.E.2d 250 (2006). Our de novo review begins with the presumption "that Congress did not intend to displace state law. [Citation.]" Village of Frankfort v. Environmental Protection Agency, 366 Ill. App. 3d 649, 659, 852 N.E.2d 522 (2006). Whether federal law preempts state law is a question of congressional intent. People v. Chicago Magnet Wire Corp., 126 Ill. 2d 356, 361, 534 N.E.2d 962 (1989). "Congress' intent to preempt State law may be manifested 'by express provision, by implication, or by a conflict between federal and state law.' " Busch v. Graphic Color Corp., 169 Ill. 2d 325, 335, 662 N.E.2d 397 (1996), quoting New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 654, 131 L. Ed. 2d 695, 704, 115 S. Ct. 1671, 1676 (1995).

The defendant contends that the federal Copyright Act expressly "preempts Illinois' regulation of [the defendant's] activities in this case, [and, therefore,] his convictions under 720 ILCS 5-16-7(a) and 720 ILCS 16-8 are null and void." Where Congress "explicitly mandates the preemption of State law within a stated situation," a reviewing court need not look beyond the statutory language to determine whether the state law is

**21**

preempted.  <u>Chicago Magnet Wire Corp.</u>, 126 Ill. 2d at 361.

Pursuant to the constitutional authority granted through the

copyright clause (U.S. Const., art. I, §8, cl. 8), Congress

enacted the Copyright Act of 1976 (the Act) (17 U.S.C. §101 <u>et</u>

<u>seq</u>. (2000)).  Section 102 of the Act grants copyright protection

to "original works of authorship fixed in any tangible medium of

expression," including literary works, musical works, motion

pictures and other audio visual works, and sound recordings.[6]  17

U.S.C. §102(a) (2000).  Section 106 grants copyright owners the

exclusive right to reproduce, distribute, perform, and display

the copyrighted work, and to prepare derivative works.  17 U.S.C.

§106 (2000).  Copyright infringement may be prosecuted criminally

under section 506 of the Act.  17 U.S.C. §506 (2000).

Section 301(a) of the Act states:

> "On and after January 1, 1978, all legal
>
> or equitable rights that are equivalent to
>
> any of the exclusive rights within the
>
> general scope of copyright as specified by

---

[6] In general, only sound recordings fixed on or after

February 15, 1972, are subject to federal statutory copyright

protection.  See <u>Goldstein v. California</u>, 412 U.S. 546, 552, 37

L. Ed. 2d 163, 171, 93 S. Ct. 2303, 2307 (1973).

section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. §301(a) (2000).

The defendant argues his prosecution for violating sections 16-7(a)(2) and 16-8 of the Code are preempted by the express language in section 301(a) of the Act. Sections 16-7 and 16-8 arose from House Bill 1357 and were added to the Code with little comment from the legislature by Public Act 79-456 (Pub. Act 79-456, eff. August 14, 1975), prior to the enactment of the 1976 Copyright Act. It has been noted that by the 1970s, the spread of record piracy "had motivated about one half of the state legislatures *** to adopt criminal statutes prohibiting [record] piracy. [Citation.]" Capitol Records, Inc. v. Naxos of America, Inc., 4 N.Y.3d 540, 555, 797 N.Y.S.2d 352, 362, 830 N.E.2d 250, 260 (N.Y. 2005). This court has found that "the intent of the

**23**

legislature in enacting sections 16-7 and 16-8 was to prohibit and punish sound recording piracy."  People v. Zakarian, 121 Ill. App. 3d 968, 975, 460 N.E.2d 422 (1984), overruled on other grounds, People v. Perry, 224 Ill. 2d 312, 864 N.E.2d 196 (2007). Indeed the legislature, when discussing a 1990 amendment to sections 16-7 and 16-8, noted the statutes were "designed to get at pirateers."  86th Ill. Gen. Assem., House Proceedings, June 25, 1990, at 40 (statements of Representative Countryman).  It was the spread of record piracy, and the states' reactions to it, that also prompted Congress to amend the 1909 Copyright Act to provide federal protection for sound recordings, or at least to those fixed on or after February 15, 1972.  Capitol Records, 4 N.Y.3d at 555, 797 N.Y.S.2d at 362, 830 N.E.2d at 260.

Numerous courts, including this one, have construed section 301(a) as requiring the preemption of state statutory or common law claims where: (1) the works at issue are fixed in tangible form and fall within the "subject matter of copyright" as defined in section 102 of the Act (the subject matter prong); and (2) the legal or equitable rights granted under the state law are equivalent to the exclusive rights set forth in section 106 of the Act (the equivalency prong).  Chicago Style Productions, Inc. v. Chicago Sun Times, Inc., 313 Ill. App. 3d 45, 47, 728 N.E.2d 1204 (2000), citing Baltimore Orioles, Inc. v. Major League

Baseball Players Association, 805 F.2d 663 (7th Cir. 1986); Bilut v. Northwestern University, 296 Ill. App. 3d 42, 52, 692 N.E.2d 1327 (1998); see also Crow v. Wainwright, 720 F.2d 1224, 1225-26 (11th Cir. 1983).

As to the subject matter prong of the preemption test of section 301(a), the sound recordings at issue in this case are unquestionably fixed in tangible form and those by modern artists such as Ja Rule and Ludacris are of such recent vintage as to unquestionably fall within the subject matter of copyright. 17 U.S.C. §102(a)(7) (2000).

When addressing the equivalency prong, we look to the nature of the right involved: "a right is equivalent to one of the rights comprised by a copyright if it 'is infringed by the mere act of reproduction, performance, distribution or display.' " Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 677 (7th Cir. 1986), quoting M. Nimmer, Nimmer on Copyright §1.01(B)(l) (1985). To determine whether a preemption challenge premised on the equivalency of protected rights is successful, courts apply the so-called "extra element test." This test asks whether the state law requires an additional element that is qualitatively different from those necessary for copyright infringement. Chicago Style Productions, Inc., 313 Ill. App. 3d at 47. Put somewhat differently, courts question

**25**

whether the state law "regulate[s] conduct that is qualitatively distinguishable from that governed by federal copyright law -- i.e., conduct other than reproduction, adaptation, publication, performance, and display." Toney v. L'Oreal USA, Inc., 406 F.3d 905, 910 (7th Cir. 2005).

Before addressing whether the statutes at issue contain an extra element sufficient to save them from preemption, we address the State's contention that the extra element test does not properly function in the context of state criminal prosecutions. According to the State, the terms used in section 301(a) -- "legal or equitable rights" and a "person's entitlement" -- are "absolutely inaccurate in the context of criminal proceedings." The State also points out that the power to prosecute criminal actions has historically been reserved to the states. The State argues that Congress, in enacting section 301(a), did not intend to prohibit the states from enforcing criminal laws such as those at issue in this case.

We disagree. First, the legislative history of section 301 indicates that it is to be construed as a broad, express preemption provision. See H.R. Rep. No. 94-1476, at 130 (1976), as reprinted in _____U.S.C.C.A.N. _____,_____. ("[t]he declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so

**26**

as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively"). Congress's purpose in enacting section 301 was to adopt "a single system of Federal statutory copyright from creation," rather than the "dual system of 'common law copyright' for unpublished works and statutory copyright for published works" that existed under the former 1909 Copyright Act. H.R. Rep. No. 94-1476, at 129 (1976), as reprinted in _____U.S.C.C.A.N. _____,_____. The legislative history of section 301 has been interpreted as "clearly evidenc[ing] Congress' intent to overrule" cases such as Goldstein v. California, 412 U.S. 546, 37 L. Ed. 2d 163, 93 S. Ct. 2303 (1973), which held that the 1909 Act preempted only state laws, including criminal laws, conflicting or interfering with the federal statute's provisions. Crow, 720 F.2d at 1225.

Second, the weight of the authority leads us to conclude that Congress intended to preempt state criminal, as well as civil, actions when it reenacted section 301 in 1976. See Anderson v. Nidorf, 26 F.3d 100, 102 (9th Cir. 1994); Crow, 720 F.2d at 1226; Briggs v. State, 281 Ga. 329, 331, 638 S.E.2d 292, 295 (2006); Hicks v. State, 109 Md. App. 113, 124, 674 A.2d 55, 61 (1996); People v. Borriello, 588 N.Y.S.2d 991, 994, 155 Misc. 2d 261, 265 (1992); State v. Perry, 83 Ohio St. 3d 41, 43, 697, N.E.2d 624, 627 (1998); State v. Awawdeh, 72 Wash. App. 373, 376,

**27**

864 P.2d 965, 967 (1994) (each invoking the extra element test to decide whether preemption applied). Although not every court that has addressed the issue of preemption of a state statute has found preemption, each court has impliedly concluded that the preemption rule in section 301 was intended to apply to state criminal prosecutions. Additionally, a noted authority on copyright law has concluded that state criminal piracy laws are preempted by the federal statute:

> "[S]tate record piracy laws are pre-empted in their application to [sound recordings fixed on or after February 15, 1972,] under the rule set forth in Section 301(a). That is, such record piracy statutes postulate rights 'equivalent' to copyright in that they proscribe reproduction and/or distribution, and they apply to works that fall 'within the subject matter of copyright' as specified by Section 102(a)(7)." 1 M. Nimmer & D. Nimmer, Nimmer on Copyright §1.01(B)(2)(d), at 1-59 (April 2007).[7]

_____

[7] Numerous state antipiracy laws expressly apply only to sound recordings fixed prior to February 15, 1972. See Cal.

**28**

Third, the case upon which the State primarily relies to give us guidance as to its contention that state criminal actions cannot be preempted by federal law, Chicago Magnet Wire Corp., 126 Ill. 2d 356, is inapposite in that it deals with applying long-recognized criminal behavior in the context of workplace exposure to toxic substances that were also subject to regulations by the federal Occupational Safety and Health Act (OSHA) (28 U.S.C §651 et seq. (2000)). Cf. State v. Smith, 115 Wash. 2d 434, 798 P.2d 1146 (1990) (theft prosecution not preempted by federal copyright law). This case, on the other hand, involves state statutes that were specifically enacted to address the problem of "record piracy" by prohibiting the unauthorized distribution and reproduction of recordings not within the public domain -- a matter which has generally been left to federal regulation as authorized by the Copyright Clause of the federal constitution. Moreover, as addressed above, the legislative history of section 301 indicates Congress's purpose was to federalize copyright regulation and to "foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively." H.R. Rep. No. 94-1476, at 130

Penal Code §653h(i) (West 2004); Md. Code Ann. Criminal Law §7-308(b)(1) (West 2004); N.Y. Penal Law §275.25 (McKinney 2004).

**29**

No. 1-05-1141

(1976), as reprinted in _____U.S.C.C.A.N. _____,_____.

   We therefore reject the State's contention that Congress did not intend to preempt state criminal statutes when it reenacted section 301.  Accordingly, we turn to whether sections 16-7(a)(2) and 16-8 contain an extra element sufficient to save them from preemption.

## A.   Section 16-7(a)(2)

   Section 16-7(a)(2) does not require any additional element that qualitatively distinguishes it from copyright infringement.  Notably, the State does not contend otherwise.  Section 16-7(a)(2) forbids, among other things, the intentional, knowing, or reckless sale or use for profit of any sound or audio visual recording without consent of the owner of the master sound recording.  It is an affirmative defense if the sounds or images are within the public domain.  It is clear that in enacting section 16-7(a)(2), the legislature sought to criminalize record piracy -- that is, to prohibit the unauthorized reproduction or distribution of sound or audio visual recordings.  Consequently, it is preempted by the federal Copyright Act.  See Borriello, 588 N.Y.S.2d at 994-96, 155 Misc. 2d at 265-68 (the defendant's prosecution for violating a New York antipiracy statute was preempted by section 301 where the statute dealt exclusively with distribution and prohibited matters related to distribution); see

**30**

also Perry, 83 Ohio St. 3d at 45, 697 N.E.2d at 628 (the prosecution of an Ohio statute prohibiting the unauthorized uploading, downloading and posting of computer software was preempted by the Copyright Act because the activities the statute prohibits "are unauthorized uses governed by the copyright laws").

We recognize that section 16-7(a)(2) requires a criminal mental state, a matter not within the general scope of copyright. However, a criminal mental state has not been considered sufficient to qualify as an extra element. See Crow, 720 F.2d at 1226 (holding the additional element of scienter did not distinguish the federal theft statute at issue in that case from the tort of copyright infringement because the federal statute requires scienter, and because scienter "merely narrows the applicability of the statute"); Borriello, 588 N.Y.S.2d at 995, 155 Misc. 2d at 266 ("[d]iffering mens rea elements, such as 'awareness' or 'intent' will not provide the 'extra element' to take it out of a copyright infringement claim"); see also M. Nimmer & D. Nimmer, Nimmer on Copyright §1.01(B)(1), at 1-12 (April 2007) ("in essence, a right that is 'equivalent to copyright' is one that is infringed by the mere act of reproduction, performance, distribution, or display. *** [T]he mere fact that a state law requires scienter as a condition to

liability, whereas the Copyright Act does not, cannot save the state law from pre-emption").  The statute's provision that the defendant use the recording or cause the recording to be used "for profit" similarly does not qualify as an extra element, as one form of criminal infringement under the federal Act requires a defendant to act "for purposes of commercial advantage or private financial gain."  17 U.S.C. §506(a)(1)(A) (2000).  We therefore conclude the defendant's prosecution for violating section 16-7(a)(2) is preempted by the federal Copyright Act.

### B.  Section 16-8

Section 16-8, however, is not preempted.  Under count III, the defendant was charged with violating section 16-8 by engaging in unlawful use of unidentified sound recordings.  A recording can be "unidentified" in either of two ways: by the absence of the name and address of the actual manufacturer of the sound recording (see Zakarian, 121 Ill. App. 3d at 976 (where, at the time a violation of section 16-8 was a Class B misdemeanor, the court noted that persons dealing with counterfeit identified recordings "may be considered more culpable than those *** dealing with unidentified sound recording who do not have similar information at hand")), or by the listing of a manufacturer that is not the actual or true manufacturer of the sound recording. In this case, the State was required to prove that the defendant

was dealing in CDs that did not have "on the outside cover or jacket and on the label" the actual name of the manufacturer. 720 ILCS 5/16-7(b)(5) (West 2004). This element makes the offense " 'qualitatively' different from a copyright infringement-type activity and distinguishing the underlying rights from those addressed by copyright law [so that it will] not be deemed 'equivalent' [citation]." Borriello, 588 N.Y.S.2d at 994, 155 Misc. 2d at 265. The crucial element of this offense is that the cover, jacket or label is in a deceptive condition by the absence of the actual name of the manufacturer. No infringement of the rights of the copyright owner is necessary. In fact, as a New York court noted in finding a similar state statute not preempted by the federal Copyright Act, this provision can be violated even if the person dealing in such unidentified recordings has "permission and authority to sell the recording from the copyright owner." Borriello, 588 N.Y.S.2d at 996, 155 Misc. 2d at 268. Thus, the protection afforded by section 16-8 is not to the copyright owner, but to the prospective consumer of the sound recording. Our legislature has determined that consumers of such recordings are entitled to be informed of the "actual name and address of the manufacturer" and mandates, subject to a criminal penalty, that such information be prominently displayed on the packaging of the CD. In this case,

**33**

the defendant was charged with unlawful use of unidentified sound recordings in that the manufacturer listed on the photocopy of the CD covers was not the actual manufacturer of the CDRs he was dealing in. As we have previously found, the evidence was sufficient to sustain this charge.

Section 16-8 thus incorporates an extra element beyond those encompassed within section 106 of the Act and, consequently, is not preempted. See Anderson, 26 F.3d at 102; Briggs, 281 Ga. App. at 331, 638 S.E.2d at 295; Hicks, 109 Md. App. at 125, 674 A.2d at 62; Borriello, 588 N.Y.S.2d at 996, 155 Misc. 2d at 268; Awawdeh, 72 Wash. App. at 377, 864 P.2d at 968. Our holding is consistent with courts from other jurisdictions that have construed such "packaging" statutes as consumer protection statutes that serve interests qualitatively different from those served by the federal copyright laws. See Anderson, 26 F.3d at 102; Borriello, 588 N.Y.S.2d at 996, 155 Misc. 2d at 268; Awawdeh, 72 Wash. App. at 377, 864 P.2d at 968 (all noting that the packaging statutes at issue were consumer protection statutes intended to protect the public from false and deceptive commercial practices). Our reading of section 16-8, in light of similar statutes from other states, makes clear that our legislature had similar consumer protection goals in mind when it enacted section 16-8.

**34**

Accordingly, we conclude the defendant's remaining conviction under count three for violating section 16-8 is not preempted by federal copyright law.

### III.  Due Process Claim

We next address the defendant's contention that section 16-8 violates substantive due process because it "sweeps too broadly by punishing innocent conduct."  His argument is founded on his claim that the statute lacks "a culpable intent, [so that] the statute violates due process and is void."  The constitutionality of a statute is reviewed de novo.  People v. Jones, 223 Ill. 2d 569, 596, 861 N.E.2d 967 (2006).  Whether a statute, not affecting fundamental rights, complies with substantive due process is determined under the rational basis test.  People v. Wright, 194 Ill. 2d 1, 24, 740 N.E.2d 755 (2000).  A statute will be upheld under this test where "it 'bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective.' "  Wright, 194 Ill. 2d at 24, quoting People v. Adams, 144 Ill. 2d 381, 390, 581 N.E.2d 637 (1991).  A statute violates the rational basis test where it could be used to punish innocent conduct.  Wright, 194 Ill. 2d at 28.

The defendant relies on cases such as Wright, 194 Ill. 2d 1, 740 N.E.2d 755, People v. Zaremba, 158 Ill. 2d 36, 630 N.E.2d 797

(1994), People v. Wick, 107 Ill. 2d 62, 481 N.E.2d 676 (1985), and People v. Carpenter, 368 Ill. App. 3d 288, 856 N.E.2d 551 (2006), appeal allowed, 222 Ill. 2d 611, 862 N.E.2d 235 (2007), to support his contention that section 16-8 violates due process because the statute "does not require, as an element of the offense, that the manufacture or sale of a sound or audio visual recording be made without the consent of the owner or be done with a fraudulent purpose."

While it is true that proof of the lack of consent of the owner is not required under section 16-8,[8] we perceive no due process requirement that culpable intent turn solely on the absence of consent of the copyright owner. In fact, it is the absence of that element that qualitatively distinguishes the rights protected by section 16-8 from the underlying rights addressed by copyright law. See Borriello, 588 N.Y.S.2d at 996, 155 Misc. 2d at 268 (a violation of consumer protection provision

---

[8] While the State charged this element in count IV, we agree with the defendant, based on the language in section 16-8, that lack of consent of the owner is not an element of the offense. But see 2 J. Decker, Illinois Criminal Law §11.28, at 11-41 (2d ed. 1995) (stating "without authorization of the owner" is an element of section 16-8).

may occur even with permission of the copyright owner). If lack of consent were an element of the offense, section 16-8 would, for all practical purposes, be indistinguishable from section 16-7(a)(2), which we have found to be preempted. Under section 16-7(a)(2), lack of consent of the owner is an element of the offense. If there is lack of consent of the owner of the "master of the sound recording" (720 ILCS 5/16-7(b)(2) (West 2004)), then it necessarily follows the manufacturer of any such sound recordings would not be authorized by the owner of the master recording (720 ILCS 5/16-7(h)(West 2004)) to produce such recordings. A person selling such discs from that manufacturer would violate section 16-7(a)(2) if he knowingly sells for profit such sound recordings because they would be without consent of the owner, whether with or without the actual name and address of the manufacturer on the packaging. In the case where the actual name and address of the manufacturer are not on the packaging, a person that knowingly sells such discs would also violate section 16-8 under the defendant's added element theory. In the first instance, the discs offered for sale would be counterfeit recordings in violation of section 16-7(a)(2) that may also be "unidentified"; in the second instance, the discs offered for sale would be "unidentified" recordings in violation of section 16-8 that would also necessarily be counterfeit. Thus, if lack

of consent were to provide the "culpable intent" of section 16-8 to pass the defendant's due process test, a violation of that provision would be a violation of section 16-7(a)(2) and thus, equivalent to, or qualitatively the same as, the protection afforded by the federal Copyright Act. Adding such an element would provide a basis to challenge under a preemption claim section 16-8 with lack of consent as an element. In that instance, the protection afforded by section 16-8 would go to the benefit of the copyright holder and only secondarily to the consumer. We are not persuaded that due process requires that section 16-8 have a culpable mental state based on the absence of consent of the copyright owner as the defendant urges. Nonetheless, we examine section 16-8 as written to determine whether it is a reasonable method of accomplishing the desired objective of the legislation, without "the capacity to sweep in innocent people who could reasonably believe they were engaging in lawful activity." Carpenter, 368 Ill. App. 3d at 297.

The cases upon which the defendant relies have what has been described as "[a] common theme" running through them. Carpenter, 368 Ill. App. 3d at 297. "Each statute had the capacity to sweep in innocent people who could reasonably believe they were engaging in lawful activity. That is, the acts that comprised the offenses were not necessarily criminal in nature. The

**38**

statutes did not accomplish their legislative purpose." Carpenter, 368 Ill. App. 3d at 297.

In Zaremba, the supreme court identified the fault with the theft-related legislation as the absence of a culpable mental state, beyond the knowing possession of the stolen item itself. Under the challenged provision, even a law enforcement official would violate the provision in the course of carrying out his duty. The provision "would criminalize the actions of a police evidence technician who took from a police officer for safekeeping the proceeds of a theft." Zaremba, 158 Ill. 2d at 38. Thus, the court determined that the legislation would "potentially subject[] wholly innocent conduct to punishment." Zaremba, 158 Ill. 2d at 42. In other words, the method used to further the interest "of breaking up fencing operations" cast too great a net as to capture wholly innocent conduct. Zaremba, 158 Ill. 2d at 43.

In Wick, the supreme court considered a due process challenge to the aggravated arson statute. The unlawful purpose required for simple arson was not required for aggravated arson. Wick, 107 Ill. 2d at 64. In its analysis the court noted, "proof of the elements of aggravated arson cannot themselves constitute proof of arson." Wick, 107 Ill. 2d at 65. Ultimately, the court concluded that the absence of the requirement of proof of an

unlawful purpose in setting a fire (as is required in simple arson), "sweeps too broadly by punishing innocent as well as culpable conduct in setting fires." Wick, 107 Ill. 2d at 66. Once again, as in Zaremba, the reach of the aggravated arson statute went beyond the criminal conduct defined by simple arson to reach innocent conduct. The "method" chosen by the legislature to combat arsonists swept too broadly in that the set of activities penalized by the aggravated arson statute was much greater than the set of activities penalized by the simple arson statute.

In Carpenter, part of the challenge to the statute at issue was that "it requires no criminal mental state and potentially punishes innocent conduct." Carpenter, 368 Ill. App. 3d at 294. The purpose behind the legislation was "to stop the use of vehicular secret compartments to hide guns, narcotics, and other contraband." Carpenter, 368 Ill. App. 3d at 295. Against the State's contention that the legislation would not punish individuals that conceal lawful items, this court found that the legislation would also penalize individuals that used "concealed compartments to keep legally possessed items from the view of law enforcement officer [even though such individuals had] no criminal purpose." Carpenter, 368 Ill. App. 3d at 295. The fault with this legislation was that it "had the capacity to

**40**

sweep in innocent people who could reasonably believe they were engaging in lawful activity." Carpenter, 368 Ill. App. 3d at 297. There again, the set of activities the secret compartment statute sought to penalize went beyond dealing "with illegal contraband." Carpenter, 368 Ill. App. 3d at 295.

Finally, in Wright, the supreme court addressed the constitutionality of a section of the Illinois Vehicle Code that made it a felony to knowingly fail to maintain records relating to the acquisition and disposition of vehicles and parts. The court found that the legislative purpose in enacting the statute was to combat the transfer or sale of stolen vehicles or parts. However, because the statute potentially punished innocent conduct, such as the failure to maintain records due to disability, family emergency, or incompetency, the court found it was not reasonably designed to serve that legislative purpose. Wright, 194 Ill. 2d at 28. Once again, the fault in the legislation was that the method selected to combat stolen vehicles or parts would reach a greater set of activities - conduct that had nothing to do with either stolen vehicles or parts - than the set of activities the legislation was aimed at combating.

Against the background of these cases, we address the defendant's due process claim that section 16-8 may potentially

**41**

punish innocent conduct. According to the defendant, the legislature's purpose in enacting section 16-8 was "to protect the rights of owners of sound or audio visual recordings from theft or misappropriation."

While it is true the interests that sections 16-7 and 16-8 were enacted to protect include the rights of owners of sound recordings from theft or misappropriation, sections 16-7 and 16-8 each serve a different function in the overall scheme of the legislation. The focus of protection afforded by section 16-7 is on the owner of the copyright holder. One cannot transfer (section 16-7(a)(1)) or offer for sale (section 16-7(a)(2)) sound recordings without consent of the owner. The focus of section 16-8, on the other hand, is to protect the consumer from buying what is represented to be an authorized sound recording when the packaging of the sound recording fails to provide the legislatively mandated information that defines an authorized sound recording. Because section 16-8 is a consumer protection statute, a violation of the section 16-8 turns on the information provided on the packaging of the sound recordings. While section 16-8 may also serve to protect the rights of owners of sound recordings, it does so indirectly, by seeking to protect consumers from being sold deceptive CDs.

In each of the cases set out above, the method adopted by

**42**

the legislature captured activities that were outside the set of criminal activities the legislation was meant to penalize.  In fact, "the acts that comprised the offenses were not necessarily criminal in nature." Carpenter, 368 Ill. App. 3d at 297.  The courts identified such "acts" as lacking a "culpable mental state."  Adding a culpable mental state would have narrowed the set of activities punished by the challenged legislation to criminal conduct.  Here, however, the set of criminal activities the legislation was meant to penalize is identical to the activities captured by section 16-8.  The desired objective is to punish dealings in "unidentified" sound recordings.  Sound recordings are unidentified when the packaging fails to identify the actual manufacturer.  Requiring that the packaging of CDs (or CDRs for that matter) placed into the market stream "for profit" accurately identify the manufacturer of the CDs is a reasonable method to accomplish the desired objective of protecting the interest of consumers in the course of buying sound recordings.  The method used to protect the interest of consumers of sound recordings captures activities that are no more or no less than the prohibited dealings in "unidentified sound recordings."  The reach of the statute is no greater than the desired goal.  By statutory definition, no truly innocent conduct is captured by the method selected to accomplish the desired objective.  We are

**43**

unpersuaded that there exists a method more reasonable to accomplish the legislative objective than that which the legislature has decided upon. A culpable mental state beyond that which section 16-8 requires is unnecessary because by statutory definition those that deal in "unidentified" recordings are necessarily engaged in acts that are criminal in nature; they are not engaged in wholly innocent conduct.

The defendant posits the hypotheticals of a home-produced DVD by parents of a "charming and vivacious toddler" that the parents plan to distribute for profit and of the independent performer seeking to sell her own CDs, each of whom knowingly[9] fails to identify themselves or herself as the manufacturer and performer in the packaging of the audio visual or sound recordings as examples of innocent conduct captured by section 16-8. While we cannot deny that the dealing in either such improperly packaged DVDs or CDs would expose the parents or independent performer to literal violations of section 16-8, we recognize as well that "[t]he legislature is granted broad

_____

[9] The defendant used the mental state of "negligently" in his brief. Section 16-8 includes the mental states of intentionally and knowingly. The defendant does not suggest that his argument turns on the use of "negligently."

**44**

discretion in defining crimes and affixing their punishment." People v. Arna, 168 Ill. 2d 107, 114, 658 N.E.2d 445 (1995). In the course of balancing the interests between consumers and independent performers seeking to vend their recordings, the legislature has sided with the consumer. As previously noted in our discussion of the claimed preemption of section 16-8, this type of consumer protection provision can be violated even "if the transferor has permission and authority to sell the recording from the copyright owner if the labels or packages are deceptive." Borriello, 588 N.Y.S.2d at 996, 155 Misc. 2d at 268. Those are the strictures of the law passed by our legislature. While the sanctions imposed are criminal sanctions, it is not within our purview to question the wisdom of the legislation passed by our elected representatives, except when it violates constitutional rights and we see no such infirmity here. See City of Chicago v. Holland, 206 Ill. 2d 480, 489, 795 N.E.2d 240 (2003) (recognizing that "the General Assembly is free to enact any legislation that the constitution does not expressly prohibit"); Best v. Taylor Machine Works, 179 Ill. 2d 367, 377 (1997) (the role of courts is not to judge the prudence of decisions by the General Assembly). In order to protect against record piracy and protect consumers against deceptive recordings, the rules regarding listing the actual manufacturer on CD

**45**

packaging must be followed by all who deal in such items.  Thus, unlike the statutes involved in <u>Wright</u>, <u>Carpenter</u>, <u>Wick</u> and <u>Zaremba</u>, the reach of section 16-8 extends no further than to the very activity that the legislature seeks to prohibit - the sale of unidentified recordings - whether that activity is engaged in by a party unaware of what the law requires or one with full knowledge that he is dealing in counterfeit recordings.  Section 16-8 seeks to protect the consumers of sound and audio visual recordings by making it illegal to deal in unidentified recordings.  We are compelled to find section 16-8 bears a reasonable relationship to that interest and the method used to protect that interest is reasonable.

Having found no constitutional infirmity in section 16-8, we are left with the concern expressed for the parties set out in the defendant's hypotheticals.  Our only response is that the prosecution of either of the uninformed vendors under section 16-8 appears remote, if not nonexistent.  In the two counts under section 16-8 filed against the defendant in this case, the charges alleged a lack of consent of the copyright holder.  This allegation, while not an element of the offense, suggests before a prosecution such as envisioned by the defendant by his hypotheticals, the lawful owner of the recording would be determined.  As such, the scenarios of the parents of the

**46**

vivacious toddler and the independent performer present "nonrecurrent anomalies, the prosecution of which could well be left to prosecutorial discretion."  See People v. Marin, 342 Ill. App. 3d 716, 729, 795 N.E.2d 953 (2003) (noting that "the legislature should not be required to carry the burden of carving out every possible [anomalous] exception at the risk of having its statute declared facially unconstitutional").

The defendant's alternative suggestion that no fraudulent conduct is required under section 16-8 also falls short of the mark.  By its very nature as a consumer protection statute, section 16-8 serves to protect consumers against deceptive conduct as to the actual or true manufacturer of the sound recordings offered to the public even where the deceptive conduct amounts to no more than the absence of mandated information of the manufacturer or performer on the packaging of the CD or DVD.

Accordingly, we reject the defendant's contentions.  As addressed above, while section 16-8 was passed as part of an effort to curtain record piracy, the specific purpose of section 16-8 is to protect consumers.  Consumer protection is a legitimate state interest (Pennell v. San Jose, 485 U.S. 1, 13, 99 L. Ed. 2d 1, 15, 108 S. Ct. 849, 859 (1988)), and the packaging requirements of section 16-8 are narrowly tailored to serve that purpose.

**47**

The defendant also argues section 16-8 runs afoul of the first amendment "because it compels the disclosure of a speaker's identity by those wishing to remain anonymous for legitimate reasons." The defendant cites to the Supreme Court's decision in Talley v. California, 362 U.S. 60, 4 L. Ed. 2d 559, 80 S. Ct. 536 (1960), for support. However, the defendant's discussion of this issue in his brief, contained in approximately one-half of one page, is so lacking in analysis that under Supreme Court Rule 341, we need not consider it. 210 Ill. 2d R. 341(h)(7).

## CONCLUSION

For the reasons stated above, the defendant's conviction under count III is affirmed. His conviction under count I is reversed as preempted by the federal Copyright Act. His convictions under counts II and IV are reversed based on the insufficiency of the evidence.

Affirmed in part and reversed in part.

CAHILL, P.J., and R. GORDON, J., concur.