(No. 105453.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PAUL WILLIAMS, Appellee.

*Opinion filed November 19, 2009.*

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine and Anita Alvarez, State's Attorneys, of Chicago (James E. Fitzgerald, Alan J. Spellberg and Anthony M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, State Appellate Defender, Patricia Unsinn, Deputy Defender, and Ahmed A. Kosoko, As-

sistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

This case involves the constitutionality of Illinois statutory provisions that make criminal offenses out of the acts of pirating sound recordings produced by others and failing to identify sound recordings with a label containing the actual name and address of the person who manufactured the recording. The appellate court found that the antipiracy provision was preempted by the federal Copyright Act of 1976, but it then rejected due process and first amendment challenges to the constitutionality of the labeling provision, which proscribes use of unidentified sound recordings. For the reasons that follow, we affirm the judgment of the appellate court in all respects.

## BACKGROUND

The State charged defendant, Paul Williams, in a four-count information with violating sections 16—7 and 16—8 of the Criminal Code of 1961 (the Code) (720 ILCS 5/16—7, 16—8 (West 2004)). Section 16—7 of the Code is an antipiracy provision, which states in relevant part:

"(a) A person commits unlawful use of recorded sounds or images when he:

(1) Intentionally, knowingly or recklessly transfers or causes to be transferred without the consent of the owner, any sounds or images recorded on any sound or audio visual recording with the purpose of selling or causing to be sold, or using or causing to be used for profit the article

to which such sounds or recordings of sound are transferred.

(2) Intentionally, knowingly or recklessly sells, offers for sale, advertises for sale, uses or causes to be used for profit any such article described in subsection 16—7(a)(1) without consent of the owner." 720 ILCS 5/16—7(a)(1), (a)(2) (West 2004).

Section 16—7 defines "owner" as "the person who owns the master sound recording on which sound is recorded and from which the transferred recorded sounds are directly or indirectly derived, or the person who owns the rights to record or authorize the recording of a live performance." 720 ILCS 5/16—7(b)(2) (West 2004). A "master sound recording" is the original physical object on which a given set of sounds were first recorded and from which all other recordings are derived. 720 ILCS 5/16—7(b)(4) (West 2004).

Section 16—8 is the unidentified use of sound recordings statute and provides in relevant part as follows:

"(a) A person commits unlawful use of unidentified sound or audio visual recordings when he intentionally, knowingly, recklessly or negligently for profit manufactures, sells, distributes, vends, circulates, performs, leases or otherwise deals in and with unidentified sound or audio visual recordings or causes the manufacture, sale, distribution, vending, circulation, performance, lease or other dealing in and with unidentified sound or audio visual recordings." 720 ILCS 5/16—8(a) (West 2004).

The Code defines "unidentified sound or audio visual recording" as a "sound or audio visual recording without the actual name and full and correct street address of the manufacturer, and the name of the actual performers or groups prominently and legibly printed on the outside cover or jacket and on the label of such sound or audio visual recording." 720 ILCS 5/16—7(b)(5) (West 2004).

Counts I and II of the information charged defendant with violations of section 16—7 (unlawful use of recorded sounds or images), and counts III and IV charged viola-

tions of section 16—8 (unlawful use of unidentified sounds or audio visual images). Specifically, count I alleged that defendant intentionally or knowingly offered for sale sounds recorded on compact discs (CDs) without the consent of the owner of the master recording, and count II alleged that defendant committed the offense with respect to sounds or images recorded on digital video discs (DVDs). See 720 ILCS 5/16—7 (West 2008). Count III alleged that defendant failed to identify the manufacturer of the CDs he offered for sale, and count IV alleged that he failed to identify the manufacturer of the DVDs he offered. See 720 ILCS 5/16—8 (West 2008).

The cause proceeded to a bench trial in the circuit court of Cook County, and the evidence presented at trial is fully set forth by the appellate court in its opinion, and we will set forth here only those facts necessary to the disposition of the present appeal. 376 Ill. App. 3d 875. It is sufficient to note that the evidence showed that defendant attempted to sell pirated compact disc recordables (CDRs) at a laundromat in Chicago. It was explained that illegal music is burned from CDs to CDRs. Many of the CDRs that defendant possessed and offered for sale contained songs of contemporary artists; the master recording to those songs or CDs was owned by the five major labels—Universal, Sony, EMI, BMG and Time-Warner—and defendant was not authorized to distribute this music. It was also shown that the CDs did not have a label containing the true name and address of the manufacturer.

Defendant was convicted of all four counts and sentenced to two years' probation. The appellate court affirmed defendant's conviction under count III, which was based on a violation of section 16—8 of the Code. 376 Ill. App. 3d 875. But it reversed the remaining counts. In doing so, it found that count I, which was based on a violation of section 16—7 of the Code, was

expressly preempted by section 301 of the federal Copyright Act of 1976 (Act or Copyright Act) (17 U.S.C. §101 *et seq.* (2000)). 376 Ill. App. 3d at 891. It also found that the evidence presented pertaining to the nature of the DVDs was insufficient to support the convictions under counts II and IV. 376 Ill. App. 3d at 885-86.

The State filed a petition for leave to appeal challenging the appellate court's ruling that section 16—7 was preempted. We allowed the State's petition for leave to appeal. See 210 Ill. 2d R. 315. Before this court, the State challenges only the reversal of count I based on preemption and does not challenge the appellate court's reversal of counts II and IV based on the insufficiency of the evidence. Defendant in turn challenges the appellate court's ruling that affirmed his conviction under count III, contending that section 16—8 violates the free speech clause of the first amendment (U.S. Const., amend. I) and the due process clause of the fourteenth amendment (U.S. Const., amend. XIV). See 155 Ill. 2d R. 318(a)) ("[A]ny appellee *** may seek and obtain any relief warranted by the record on appeal without having filed a separate petition for leave to appeal or notice of cross-appeal or separate appeal").

## ANALYSIS

### I. Federal Preemption of Section 16—7

We first address the State's claim that the appellate court incorrectly determined that the state's antipiracy provision of section 16—7 is preempted by federal law. The supremacy clause of article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Thus, state law is null and void if it conflicts with federal law. *Sprietsma v. Mercury Marine*, 197 Ill. 2d 112, 117 (2001),

*rev'd on other grounds*, 537 U.S. 51, 154 L. Ed. 2d 466, 123 S. Ct. 518 (2002). Generally, there is a presumption that historic state police powers are not superceded by federal law. *Sprietsma*, 197 Ill. 2d at 117. This presumption does not apply, however, where the proscribed activity is also within the realm of traditional federal regulation and federal concerns predominate in the case. *Sprietsma*, 197 Ill. 2d at 118-19.

Here, we do not believe that the presumption is applicable. Illinois first enacted a statute specifically protecting sound recordings on August 14, 1975, with the enactment of section 16—7. See Ill. Ann. Stat., ch. 38, par 16—7, Historical Note, at 224 (Smith-Hurd 1977). But Congress first protected sound recordings with an amendment to the Copyright Act in 1971. *Goldstein v. California*, 412 U.S. 546, 552, 37 L. Ed. 2d 163, 171, 93 S. Ct. 2303, 2307 (1973) (the amendment was passed to allow federal copyright protection of sound recordings fixed, published and copyrighted on and after February 15, 1972). It did so pursuant to its authority under the federal constitution, which grants Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, §8, cl. 8. Despite this constitutional provision, the power to define and protect copyrightable property was regarded as concurrent, that is, shared by the federal and state governments; the constitutional provision did not, of itself, vest exclusive control of the field to Congress. See *Hicks v. State*, 109 Md. App. 113, 120-21, 674 A.2d 55, 59 (1996), citing *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 604, 8 L. Ed. 1055, 1060 (1834). Until the enactment of the Copyright Act of 1976, federal law, for the most part, protected only certain kinds of published works; it was state law, to the extent that it existed at all, that protected unpublished works. See *Hicks*, 109 Md. App. at 121, 674 A.2d at 59.

The constitutional authority of Congress to preempt state law has never been in question, but, since the first copyright law was enacted in 1790, Congress had simply chosen not to exercise that authority. *Hicks*, 109 Md. App. at 121, 674 A.2d at 59, citing *Goldstein*, 412 U.S. at 560, 37 L. Ed. 2d at 176, 93 S. Ct. at 2311. Then, in 1976, Congress abolished the dual system by enacting a preemption provision in section 301 of the Act that was intended to create a single federal system. The legislative record indicates:

"Section 301, one of the bedrock provisions of the bill, would accomplish a fundamental and significant change in the present law. Instead of a dual system of common law copyright for unpublished works and statutory copyright for published works, which has been the system in effect in the United States since the first copyright statute in 1790, the bill adopts a single system of Federal statutory copyright from creation. Under section 301 a work would obtain statutory protection as soon as it is 'created' or, as that term is defined in section 101, when it is 'fixed in a copy or phonorecord for the first time.' Common law copyright protection for works coming within the scope of the statute would be abrogated, and the concept of publication would lose its all-embracing importance as a dividing line between common law and statutory protection and between both of these forms of legal protection and the public domain.

By substituting a single Federal system for the present anachronistic, uncertain, impractical, and highly complicated dual system, the bill would greatly improve the operation of the copyright law and would be much more effective in carrying out the basic constitutional aims of uniformity and the promotion of writing and scholarship.
***

*** One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in the Federalist, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in

the separate courts of the various States. Today, when the methods for dissemination of an author's work are incomparably broader and faster than they were in 1789, national uniformity in copyright protection is even more essential than it was then to carry out the constitutional intent." H.R. Rep. No. 94—1476, at 129 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5745.

Because the question in this case is whether Congress has expressly preempted the field in an area where it unquestionably has always had at least shared concurrent jurisdiction (never mind the passage of an expressed preemption provision in 1976), and Illinois had not traditionally exercised authority in the area of sound recordings, we conclude that protection of sound recordings is more traditionally within the realm of federal protection in Illinois and, as we will explain more fully below, federal concerns predominate in this area. Accordingly, there is no presumption in favor of nonpreemption in this case.

Federal law preempts state law under the supremacy clause in any one of the following three circumstances: (1) express preemption—where Congress has expressly preempted state action; (2) implied field preemption—where Congress has implemented a comprehensive regulatory scheme in an area, thus removing the entire field from the state realm; or (3) implied conflict preemption—where state action actually conflicts with federal law. *Sprietsma v. Mercury Marine*, 197 Ill. 2d at 117. Federal preemption presents a question of law that is subject to *de novo* review. *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 231 Ill. 2d 399, 404 (2008).

The key inquiry in any preemption analysis is to determine the intent of Congress. *Comcast Cable Holdings*, 231 Ill. 2d at 405. Where the federal statute at issue contains an express preemption clause, our task begins with a focus on the plain wording, as it " 'neces-

sarily contains the best evidence of Congress' pre-emptive intent.' " *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63, 154 L. Ed. 2d 466, 477, 123 S. Ct. 518, 526 (2002) (*rev'g on other grounds* 197 Ill. 2d 112 (2001)), quoting *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664, 123 L. Ed. 2d 387, 396, 113 S. Ct. 1732, 1737 (1993). Additionally, in the interest of a uniform body of precedent, we will give "considerable weight" to the decisions of federal courts that have addressed preemption of laws protecting copyrightable material. See *Sprietsma*, 197 Ill. 2d at 120. As we have repeatedly recognized, uniformity of decision is an important consideration when state courts interpret federal statutes. *Sprietsma*, 197 Ill. 2d at 120 (citing *Weiland v. Telectronics Pacing Systems, Inc.*, 188 Ill. 2d 415, 422 (1999), *Wilson v. Norfolk & Western Ry. Co.*, 187 Ill. 2d 369, 383 (1999), and *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 335 (1996)).

The parties argue this case from the perspective of express preemption based on section 301(a) of the federal Copyright Act, which provides in relevant part:

"On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. §301(a) (2000).

Courts have read the plain language of section 301 as establishing a two-part test in preemption cases. Under that test, a state statute is preempted (1) if the works at issue are fixed in tangible form and come within the subject matter of copyright as defined by section 102 of the Act (subject matter prong) and (2) the rights granted under state law are "equivalent" to any of those

exclusive rights "within the general scope of copyright" that are provided by the Act in section 106 (equivalency prong). See, *e.g., Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 674 (7th Cir. 1986); *Crow v. Wainwright*, 720 F.2d 1224, 1225-26 (11th Cir. 1983). In other words, the first prong concerns whether the work that is the subject of the state prosecution falls within the "subject matter of copyright," and the second prong looks at whether the elements of a cause of action for copyright infringement are equivalent to the elements of the state crime, exclusive of any *scienter* element. *Crow*, 720 F.2d at 1226. The "extra element" of the second prong not only must distinguish the state claim from federal copyright infringement, but must also change the state law so that it is "qualitatively different" from it. *Rosciszewski v. Arete Associates, Inc.*, 1 F.3d 225, 229-30 (4th Cir. 1993).

As to the first prong, the sound recordings that defendant offered for sale—and which are the subject of his prosecution under section 16—7 of the Code—clearly fall within the subject matter of copyright, as section 102(a)(7) of the Copyright Act provides protection for "sound recordings." 17 U.S.C. §102(a)(7) (2000); *Crow*, 720 F.2d at 1226. Therefore, we need only assess whether the rights at issue are equivalent to the exclusive rights mentioned in section 106 of the Copyright Act.

Before addressing the equivalency prong, however, we note that the State argues that Congress intended to preempt only state civil laws, not criminal laws, because section 301 of the federal Act provides only that "no person" is entitled to a right equivalent to copyright protection under state law. According to the State, criminal antipiracy laws protect society as a whole and not the copyright itself or the person holding the copyright. Therefore, according to the State, Congress preempted states from making the transfer of recorded

sounds without the consent of the owner a civil wrong, but permitted states to make it a crime. Also, the State claims that Congress only intended to abrogate the "dual system" that had allowed states to address nonpublished works in the civil context.

We believe that the State's argument is at odds with the language of the federal Act, the legislative history of the federal preemption provision and the federal and state case law interpreting the Act. First, we note that the United States Supreme Court has expressly declared that state, criminal antipiracy statutes like the one at issue in this case do provide "copyright protection." *Goldstein*, 412 U.S. at 550-51, 37 L. Ed. 2d at 170, 93 S. Ct. at 2306-07. Furthermore, the Supreme Court in *Goldstein* unequivocally recognized that this form of copyright protection by means of a state antipiracy law is nothing less than an "exercise of the power to grant copyrights" by the state. *Goldstein*, 412 U.S. at 558-59, 37 L. Ed. 2d at 174-75, 93 S. Ct. at 2310-11. Thus, the State's argument in the present case that this kind of law does not protect the copyright holder is not persuasive.

In *Goldstein*, a California statute, similar to the one in the case at bar, made it a criminal offense to knowingly and willfully transfer recorded sounds with the intent to sell the article on which the sounds are transferred without the consent of the owner. As is the case under the Illinois statute, "owner" was defined under the California statute as the person who owns the master sound recording. *Goldstein*, 412 U.S. at 548 n.1, 37 L. Ed. 2d at 169 n.1, 93 S. Ct. at 2305 n.1. *Goldstein* was argued and decided a full three years before the expressed preemption clause of section 301 was enacted by Congress and then took effect. Thus, the defendant in that case was limited to arguing under theories of implied conflict and field preemption. The crucial fact in *Goldstein* was that the sound recordings that were pirated by

the defendant were all "fixed" before February 15, 1972. This is important because in 1971 Congress passed an amendment to the Copyright Act of 1909 thereby giving federal copyright protection to sound recordings for the first time. The 1971 amendment, however, only protected "sound recordings 'fixed, published, and copyrighted' on and after February 15, 1972," and was not in any way to be construed as affecting any rights with respect to sound recordings fixed before February 15, 1972. *Goldstein*, 412 U.S. at 552, 37 L. Ed. 2d at 171, 93 S. Ct. at 2307. The *Goldstein* Court embarked on a discussion explaining why the 1971 amendment was inapplicable to recordings fixed before February 15, 1972, and why the Copyright Act of 1909 (without the 1971 amendment) did not apply to sound recordings and thus did not conflict with California's antipiracy statute. The Court concluded by stating that "[u]ntil and unless Congress takes further action with respect to recordings fixed prior to February 15, 1972, the California statute may be enforced against acts of piracy such as those which occurred in the present case." *Goldstein*, 412 U.S. at 571, 37 L. Ed. 2d at 182, 93 S. Ct. at 2317.

In the case before us, the sound recordings at issue were copyrighted by artists of recent vintage, and there is no question that the recordings were fixed and published only after February 15, 1972. Moreover, since the *Goldstein* decision, Congress has enacted an express preemption provision. Congress was of course aware of the 1973 *Goldstein* decision when it amended the Copyright Act in 1976 with the preemption provision of section 301. The only reasonable conclusion that can be drawn is that Congress intended to make it completely clear that it wanted to preempt *all* state law protection for sound recordings fixed after February 15, 1972, but leave room for the states to deal with recordings fixed before that date. This is borne out by the legislative record.

The Report of the House of Representatives (Report or House Report) states:

"The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

\*\*\* *All* corresponding State laws, *whether common law or statutory*, are preempted and abrogated." (Emphases added.) H.R. Rep. No. 94—1476, at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5746.

The above language is a clear indication of Congress' intent to abrogate and preempt state antipiracy laws, but Congress made its intentions even more clear in another passage in the House Report where it specifically discussed the impact that section 301 would likely have on state antipiracy laws. See H.R. Rep. No. 94—1476, at 133 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748-49. The House Report found that a "unique and difficult problem" is posed by the status of sound recordings fixed *before* February 15, 1972, the effective date of the amendment bringing recordings fixed after that date under federal copyright protection. H.R. Rep. No. 94—1476, at 133 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748-49. The Report noted that the Department of Justice had pointed out at hearings in 1975 that section 301 as then written could be interpreted as abrogating the antipiracy laws then existing in 29 states relating to *pre*-February 15, 1972, sound recordings on the grounds that these statutes proscribe activities violating rights equivalent to the exclusive rights within the general scope of copyright. The Report further noted that such a result is not intended because it would lead to a resurgence in piracy

of pre-February 15, 1972, recordings, given that they are not protected by federal copyright under the 1971 amendment. Based on this concern, section 301 was amended by the Senate at the suggestion of the Justice Department "to exclude sound recordings fixed prior to February 15, 1972 from the effect of the preemption." H.R. Rep. No. 94—1476, at 133 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5749. Importantly, there was no effort by Congress whatsoever to exclude from federal preemption sound recordings fixed after February 15, 1972, or to express its intent to allow concurrent jurisdiction between the federal and state governments in the area of prosecuting antipiracy laws. Instead, the House Report noted only a concern that the Senate bill would offer pre-February 15, 1972, recordings perpetual protection. The Report concludes by noting the following:

> "The result of the Senate amendment would be to leave pre-1972 sound recordings as entitled to perpetual protection under State law, while post-1972 recordings would eventually fall into the public domain as provided in the bill.
>
> The Committee recognizes that, under recent court decisions [read *Goldstein*], pre-1972 recordings are protected by State statute or common law, and that should not all be thrown into the public domain instantly upon the coming into effect of the new law. However, it cannot agree that they should in effect be accorded perpetual protection, as under the Senate amendment, and it has therefore revised [the legislation] to establish a future date for the preemption to take effect. The date chosen is February 15, 2047, which is 75 years from the effective date of the statute extending Federal protection of recordings."[1] H.R. Rep. No. 94—1476, at 133 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5749.

---

[1]Note that the ultimate date chosen to preempt state laws protecting pre-February 15,1972, sound recordings was February 15, 2067. See 17 U.S.C. §301(c) (2000).

The obvious import of this discussion is that the Congress had no problem with section 301 preempting state antipiracy laws relating to post-February 15, 1972, recordings. Indeed, Congress first felt compelled to add language exempting state antipiracy laws relating to pre-February 15, 1972, recordings from the effect of section 301 preemption because otherwise these recordings would be without any protection. It then realized that it wanted to preempt even those state laws at some point. Thus, it added section 301(c), which provides in relevant part that "[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067." 17 U.S.C. §301(c) (2000).

Perhaps in recognition that a state law that would attempt to legislate against piracy of post-February 15, 1972, sound recordings would be preempted, numerous state antipiracy laws expressly apply only to recordings fixed prior to February 15, 1972. See, *e.g.*, Cal. Penal Code §653h(i) (West 2004); Md. Code Ann. Criminal Law §7—308(b)(1) (West 2004); N.Y. Penal Law §275.25 (McKinney 2004).

We also note that Congress has decided to protect works subject to copyright both civilly and criminally. 17 U.S.C. §§502 through 506 (2000). In enacting such legislation, Congress has addressed both individual and societal interests in copyright protection. *Dowling v. United States*, 473 U.S. 207, 221-22, 87 L. Ed. 2d 152, 163-64, 105 S. Ct. 3127, 3135-36 (1985). Thus, congressional intent was not only to cover the civil aspect, but the criminal aspect as well. See *People v. Borriello*, 155 Misc. 2d 261, 269, 588 N.Y.S.2d 991, 997 (Sup. Ct. 1992), citing *Dowling*, 473 U.S. at 222, 87 L. Ed. 2d at 163-64, 105 S. Ct. at 3136.

Given all the circumstances mentioned above, we believe that it would border on the absurd to hold that

Congress preempted states from making unauthorized use of copyrighted material a civil wrong, but permitted the states to make the same conduct a crime. In sum, we hold that state antipiracy laws are a form of copyright protection, and we believe that Congress has clearly expressed an intent to abrogate such laws in section 301 of the Act.

Our holding is in line with the great weight of authority on the topic. Nearly every, if not every, court nationwide that has considered preemption under section 301 has either expressly or impliedly concluded that preemption was intended to apply to state criminal prosecutions. See, *e.g.*, *Anderson v. Nidorf*, 26 F.3d 100, 102 (9th Cir. 1994) (implicit in its holding was a finding that a state statute criminalizing unauthorized duplication or bootlegging of sound recordings would " 'in and of itself ... infringe one of the exclusive rights' listed in the copyright laws"), quoting *Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir. 1984); *Crow*, 720 F.2d at 1226 (applied two-part test and expressly found that a state criminal theft statute was preempted in prosecution involving bootlegged sound recordings); *Rand McNally & Co. v. Fleet Management Systems, Inc.*, 591 F. Supp. 726, 739 (N.D. Ill. 1983) ("If the state law prohibits the very act of reproducing, performing, distributing, or displaying the protected matter, then it is preempted"); *Briggs v. State*, 281 Ga. 329, 331, 638 S.E.2d 292, 295 (2006) (used the extra-element test to determine whether a sound recording labeling statute was preempted); *Hicks*, 109 Md. App. at 124, 674 A.2d at 61 (discussing *Borriello* and noting that antipiracy statutes would be preempted, but labeling statutes would not be preempted because they involve consumer protection and not the copyright related rights of the owner); *Borriello*, 155 Misc. 2d at 264-65, 588 N.Y.S.2d at 994 (applied the two-part preemption test and found that New York criminal law banning sale of

unauthorized recordings was preempted); *State v. Perry*, 83 Ohio St. 3d 41, 42-45, 697 N.E.2d 624, 626-29 (1998) (invoked two-part test and held that state criminal prosecution for unauthorized downloading of copyright material was preempted by section 301); *State v. Awawdeh*, 72 Wash. App. 373, 376, 864 P.2d 965, 967 (1994) (applied the two-part preemption test to a state criminal statute banning the failure to disclose the origin of a recording).

Of the above mentioned cases, *Crow* is paramount and has been cited and relied upon by numerous courts without any negative treatment relevant to the issues raised in the present case. In *Crow*, the defendant was convicted of selling "bootleg" eight-track tapes in violation of a Florida criminal statute that prohibited dealing in stolen property. The Court of Appeals, Eleventh Circuit, first found that the legislative history of section 301 "clearly evidences Congress' intent to overrule by statute cases such as *Goldstein v. California*, 412 U.S. 546, 93 S. Ct. 2303, 37 L. Ed. 2d 163 (1973) (holding that the Copyright Act of 1909 preempts only state laws *conflicting or interfering with* its provisions)." (Emphasis in original.) *Crow*, 720 F.2d at 1225. The court then applied the two-prong, subject matter and equivalency test and held that the defendant's conviction was null and void because the federal Copyright Act preempted Florida's antipiracy statute in that case. *Crow*, 720 F.2d at 1227.

We now turn to the second prong of the two-prong test of section 301, which examines whether the elements of copyright infringement under the federal Act are equivalent to the elements of the crime of unlawful use of recorded sounds under our Criminal Code. The State argues that section 16—7 contains two extra elements that distinguish it from the federal Act. First, the State asserts that section 16—7's consent element is condi-

tioned on ownership in "tangible property" (*i.e.*, the master sound recording), whereas consent in the Copyright Act is conditioned on the intangible property of the copyright owner. The State contends that section 202 of the Copyright Act (17 U.S.C. §202 (2000)) makes ownership of a copyright "distinct" from ownership of any material object in which the work is embodied like a master recording. Second, the State claims that the "for profit" element of section 16—7 distinguishes it from the federal Act.

We disagree with the State's contention that section 16—7 contains any additional elements that substantively distinguishes it from copyright infringement under the federal Act. The essential elements of a violation of section 16—7 correspond almost exactly to copyright infringement. As the appellate court noted, section 16—7(a)(2) forbids, among other things, the intentional, knowing, or reckless sale or use for profit of any sound recording without consent of the owner of the master sound recording. It is an affirmative defense if the sounds or images are within the public domain. The clear legislative purpose in enacting section 16—7 was to combat record piracy by prohibiting the unauthorized reproduction of sound recordings, and the United States Supreme Court has determined that such statutes afford copyright protection and are an "exercise of the power to grant copyrights." See *Goldstein*, 412 U.S. at 558-59, 37 L. Ed. 2d at 174-76, 93 S. Ct. at 2310-11. Thus, the State's argument that section 16—7 protects only "tangible" property, and therefore contains an extra element, must be rejected.

The State's argument is erroneous for the additional reason that the Copyright Act itself extends copyright protection to "original works of authorship fixed in any *tangible medium of expression* *** from which they can be *** reproduced *** either directly or with the aid of a

machine or device." (Emphasis added.) 17 U.S.C. §102(a) (2000). Sound recordings fall under this category. The State's insistence that the copyright statute covers only the interests of a copyright owner in "intangible property" is therefore not entirely accurate. While it is true that section 202 of the Copyright Act provides that "[o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied," like the master recording on which the work was first fixed (see 17 U.S.C. §202 (2000); H.R. Rep. No. 94—1476 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659), an examination of the purpose of this provision indicates that it does not give the State a way around the antipiracy provision of section 301. Rather, the purpose of section 202 has been stated as follows:

> "[T]he bill would change a common law doctrine exemplified by the decision in *Pushman v. New York Graphic Society, Inc.*, 287 N.Y. 302, 39 N.E.2d 249 (1942). Under that doctrine, authors or artists are generally presumed to transfer common law literary property rights when they sell their manuscript or work of art, unless those rights are specifically reserved. This presumption would be reversed under the bill, since a specific written conveyance of rights would be required in order for a sale of any material object to carry with it a transfer of copyright." H.R. Rep. No. 94—1476, at 124 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5740.

The fact that an "owner" of the master recording may not be a copyright holder does not take the Illinois statute out of the realm covered by the federal Act, where the statute in question is substantially a copyright infringement statute. A person who owns the master recording must still have a license from the copyright owner to legitimately consent to the distribution of the sound recording. The gravamen of section 16—7 is the protection of copyrightable works, whether the person or entity holding an interest in those works is the original

copyright holder or one who has been licensed by the copyright holder to produce and distribute those works. Thus, we conclude that the fact that the owner of the copyright might not be the actual owner of the master recording does not create an "extra element" making section 16—7 qualitatively different from copyright infringement. If a statute is "in reality" a copyright statute, it will be deemed " 'equivalent.' " *Borriello*, 155 Misc. 2d at 265, 588 N.Y.S.2d at 994.

Likewise the State's "for profit" argument is without merit. This is not an "extra element" because one form of criminal infringement under the federal Act requires a defendant to act "for purposes of commercial advantage or private financial gain." 17 U.S.C §506(a)(1) (2000). Accordingly, we conclude, as the appellate court did, that section 16—7(a)(2) is preempted by the federal Copyright Act.

## II. First Amendment and Overbreadth

We now turn to the propriety of defendant's conviction under section 16—8, which makes it a crime to deal (for profit) in sound recordings or audio visual recordings if the labeling or packaging on the recording does not display the true name and address of the manufacturer and the name of the performer. These labeling requirements, defendant argues, compel all performers and manufacturers to reveal their identities, even those who prefer to keep their speech anonymous—a protected first amendment right. Defendant seems to concede that the statute can be constitutionally applied to the particular conduct that he was charged with in this case, but he argues that the statute should be stricken on its face based on the doctrine of substantial overbreadth. A criminal law so broadly worded as section 16—8, defendant predicts, might force anonymous speakers to abstain from speech, particularly those who record unpopular messages and fear reprisal if their identities were known.

We note that section 16—8 does not impinge upon pure speech. See *Briggs*, 281 Ga. at 331, 638 S.E.2d at 294. Rather, the statute at best regulates a combination of commercial conduct and speech. See *Briggs*, 281 Ga. at 331, 638 S.E.2d at 294. Compare *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 131 L. Ed. 2d 426, 115 S. Ct. 1511 (1995) (anti-anonymity provision of political campaign literature held unconstitutional limitation on pure speech), with *Anderson v. Nidorf*, 26 F.3d 100 (9th Cir. 1994) (statute which criminalizes the selling of unidentified recordings did not regulate pure speech). Under the test set forth in *United States v. O'Brien*, 391 U.S. 367, 376-77, 20 L. Ed. 2d 672, 679-80, 88 S. Ct. 1673, 1678-79 (1968), conduct that may have both speech and "nonspeech" elements may be regulated if the statute furthers a substantial governmental interest that is unrelated to the suppression of free speech and the incidental restriction on first amendment concerns is no greater than necessary to further the governmental interest.

We further note that section 16—8, like any other statute, is presumed to be constitutional. *People v. Sanders*, 182 Ill. 2d 524, 528 (1998). The burden of rebutting that presumption is on the party challenging the law's validity. *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 406 (2006). Generally, a person to whom a statute may be constitutionally applied is not allowed to challenge the statute solely on the grounds that it could, in another context, be applied unconstitutionally to another person. *People v. Holder*, 96 Ill. 2d 444, 449 (1983). The exception is in first amendment cases, where there is a concern that the constitutionally protected activity may be deterred or chilled, thus depriving society of an uninhibited marketplace of ideas. *Virginia v. Hicks*, 539 U.S. 113, 119, 156 L. Ed. 2d 148, 157, 123 S. Ct. 2191, 2196 (2003). However, this concern must be

counterbalanced with the "substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech" or conduct. (Emphasis in original.) *Hicks*, 539 U.S. at 119, 156 L. Ed. 2d at 157, 123 S. Ct. at 2197. In order to maintain the appropriate balance, the Supreme Court has cautioned that a statute's overbreadth must be "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (Emphasis in original.) *United States v. Williams*, 553 U.S. 285, 292, 170 L. Ed. 2d 650, 662, 128 S. Ct. 1830, 1838 (2008). "Invalidation for overbreadth is ' " 'strong medicine' " ' that is not to be ' "casually employed." ' " *Williams*, 553 U.S. at 293, 170 L. Ed. 2d at 662, 128 S. Ct. at 1838, quoting *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32, 39, 145 L. Ed. 2d 451, 460, 120 S. Ct. 483, 489 (1999), quoting *New York v. Ferber*, 458 U.S. 747, 769, 73 L. Ed. 2d 1113, 1130, 102 S. Ct. 3348, 3360 (1982).

We begin our overbreadth analysis by noting that section 16—8 has features that significantly narrow its application. The first is that it applies only to "for profit" transactions. The statute therefore does not apply to transactions where a recording is distributed for free, or at a price-point geared only to cover the recording's production and distribution costs. See *Anderson v. Nidorf*, 26 F.3d 100, 103-04 (9th Cir. 1994) (noting that "commercial gain or private profit" element in California's labeling law, which is nearly identical to section 16—8, significantly narrowed the statute's application).[2]

---

[2]While it is certainly true that a speaker can be paid for speaking without forfeiting first amendment rights (*Murdock v. Pennsylvania*, 319 U.S. 105, 111, 87 L. Ed. 1292, 1297, 63 S. Ct. 870, 874 (1943) (religious tracts protected even when sold; moreover, "the pamphlets of Thomas Paine were not distributed free of charge")),

The second narrowing feature is the limited nature of the disclosure requirement for performers and groups. The statutory scheme only requires that the "name of the actual performers or groups" be disclosed (see 720 5/16—7(b)(5) (West 2004)), which means that artists may disclose whatever name they want to use *as a performer* or *as a group* on a recording. As written, section 16—8 undoubtedly permits the use of pseudonyms. The United States Supreme Court has deemed pseudonyms sufficient to maintain a speaker's anonymity. See *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-43, 131 L. Ed. 2d 426, 436-37, 115 S. Ct. 1511, 1516-17 (1995). Thus, section 16—8 is a possible burden only to manufacturers— and not all manufacturers—but only those who seek anonymity *and* profit.

With respect to the competing social costs at stake, the State asserts, and we agree, that Illinois has a substantial governmental and public interest in protecting consumers from deceptive recordings within the commercial market, particularly when that market is susceptible to counterfeits. The defendant, on the other hand, argues that section 16—8 will deter the free speech of some performers and manufacturers who want to remain anonymous. We believe that in light of the narrowed application of the statute that any overbreadth is insignificant in light of the legitimate sweep of the statute, and defendant has therefore not met his burden to establish that the social costs swing in his favor. Nor has defendant met his burden to show that the incidental restriction on first amendment activity is greater than necessary to further the governmental interest at stake.

---

it is also true that any statutory element that narrows application of a supposedly overbroad law is relevant to an overbreadth analysis. *Osborne v. Ohio*, 495 U.S. 103, 119, 109 L. Ed. 2d 98, 115, 110 S. Ct. 1691, 1701 (1990).

We also note that every court to consider a first amendment challenge to a labeling statute has rejected it. *Anderson*, 26 F.3d at 103-04; *Briggs*, 281 Ga. at 331, 638 S.E.2d at 294-95. We find the federal court of appeals decision in *Anderson* to be particularly persuasive. There, the defendant was caught selling almost 5,000 pirated tapes and was convicted for failing to accurately disclose the true manufacturer of the tapes, in violation of California's truth-in-labeling law for sound recordings. The defendant raised a first amendment overbreadth challenge, arguing the rights of performers and manufacturers to maintain their anonymity. *Anderson* found the defendant's claim based on the anonymity rights of performers and manufacturers to be "a peculiar argument considering that most of their lives are consumed in marketing their identity." *Anderson*, 26 F.3d at 104. *Anderson* further found that because one of the primary purposes of the statute is to prevent the piracy of the works of these performers and manufacturers, the probability that its disclosure requirement will exert a dreaded chilling effect on these performers and manufacturers "is close to zero." *Anderson*, 26 F.3d at 104. The court concluded that the statute can be constitutionally applied in these many instances, and that on this ground alone the defendant's substantial overbreadth claim fails. *Anderson*, 26 F.3d at 104.

Finally, the *Anderson* court noted that the defendant had cited some hypothetical examples of political or antiestablishment recordings from anonymous artists and manufacturers that could be chilled under the statute. But *Anderson* again explained that the statute applied only to recordings "sold for commercial gain or private profit," thereby greatly limiting the amount of performers and manufacturers whose speech it may chill. *Anderson*, 26 F.3d at 104. The hypothetical speakers imagined by defendant, *Anderson* concluded, did not

"establish that the overbreadth of [the statute] is substantial in comparison with its legitimate sweep." *Anderson*, 26 F.3d at 104.

*Anderson* makes clear that laws like section 16—8 can be applied constitutionally in most instances. Indeed, whenever the performer or manufacturer desires disclosure—undoubtedly the norm—section 16—8 operates without any burden on first amendment speech. Yet, to the extent that section 16—8 is overbroad, its burden on protected speech must be substantial compared to the legitimate applications. Defendant makes no showing to that effect. Instead, he cites hypothetical examples of legitimate, nonpirated recordings that would be subject to prosecution under the statute. The examples cited, however, fall under the same political or antiestablishment rubric that *Anderson* considered insubstantial in comparison with the legitimate sweep of the statute and in considering the statutes narrowing features. We agree with the assessment in *Anderson*.

Finally, defendant contends that section 16—8 should be narrowly tailored to reach only those who distribute recordings without the consent of the owner of the work, or who distribute "misrepresented recordings." But such a no-consent limitation, which might adequately serve the antipiracy interest (but which, by the way, would also subject it to a successful challenge based on federal preemption[3]), would largely defeat its consumer protection interest. A consumer has no less a defective product because the copyright owner consented to its distribution, nor is the consumer in a better position to remedy

---

[3]Numerous courts have rejected federal preemption challenges to state labeling laws precisely because they did *not* contain a requirement that a defendant act without the consent of the owner. See, *e.g.*, *Anderson*, 26 F.3d at 103; *Awawdeh*, 72 Wash. App. at 377-78, 864 P.2d at 968. Thus, defendant's proposed remedy for section 16—8 would be short lived at best.

the defect. Dealers could escape liability under section 16—8 if they simply omitted any information on the identity of the recording's manufacturer. Yet consumers—the persons section 16—8 is designed to protect—are no better off. If the recording they have purchased is defective, they are without a reliable name or address to direct their complaints or seek redress.

Equally troubling is defendant's explanation for limiting the statute's application to "misrepresented recordings." Defendant offers little elaboration on what he means by "misrepresented recordings," but presumably he means that section 16—8 would be better if it applied only to recordings that disclose information about a performer or manufacturer that is untruthful or inaccurate. Again, under defendant's proposal, dealers could escape liability by simply omitting any information on the identity of the recording's manufacturer, thereby leaving consumers in a lurch.

Finally, defendant suggests that his own conduct did not involve any misrepresentation, explaining that the works he sold "were what they were represented to be i.e., recordings of known artists who have contacts with record companies." But this argument is wrong and irrelevant because unless the recording companies disclosed on defendant's products actually manufactured the specific recordings he offered for sale—and the record shows that they did not—then defendant was in fact dealing in misrepresented recordings. At any rate, we find defendant's arguments unpersuasive for the reasons mentioned, and, therefore, we reject his first amendment claim.

### III. Due Process

Defendant next argues that even if section 16—8 does not impermissibly impede free speech, it violates substantive due process because it does not bear a reasonable relationship to its purpose and is overbroad and poten-

tially punishes innocent conduct. His theory is that the statute makes it a crime to deal in unidentified recordings but does not require the dealer to act with a criminal purpose, such as an intention to defraud or deceive a buyer, and is thus facially invalid. Defendant also asserts that if the statute is aimed at record piracy, it should require the dealer to act "without the consent" of the owner of the recording.

We again note that statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of establishing its invalidity. *People v. Carpenter*, 228 Ill. 2d 250, 267 (2008). The legislature has wide discretion to establish penalties for criminal offenses, but that discretion is limited by the guarantee of our federal constitution that a person may not be deprived of liberty without due process of law. *Carpenter*, 228 Ill. 2d at 267.

The parties agree that where, as here, a statute does not affect a fundamental constitutional right, the test for determining whether it complies with substantive due process is the rational basis test. *Carpenter*, 228 Ill. 2d at 267, citing *People v. Wright*, 194 Ill. 2d 1, 24 (2000). A statute will be upheld under that test "where 'it "bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective." ' " *Carpenter*, 228 Ill. 2d at 267-68, quoting *Wright*, 194 Ill. 2d at 24, quoting *People v. Adams*, 144 Ill. 2d 381, 390 (1991).

We reiterate that section 16—8 punishes commercial dealings in unidentified sound or audiovisual recordings, where the dealer acts intentionally, knowingly, recklessly, or negligently. 720 ILCS 5/16—8 (West 2004). Recordings are deemed "unidentified" when the name of the actual performer and the actual name and address of the manufacturer is not displayed on the recording's cover, jacket or label. 720 ILCS 5/16—7(b)(5) (West 2004). The

statute has two objectives: the first is protect consumers from purchasing deceptively packaged sound and audiovisual recordings, and the second is to combat record piracy, although this is perhaps an indirect consequence of the first objective, as piracy is a common source of deceptive packaging in the commercial recording market. See 376 Ill. App. 3d at 896-97 (explaining two objectives of section 16—8); see also *Anderson*, 26 F.3d at 101-03 (finding the same two goals in California's labeling law). Thus, the antipiracy objective dovetails into the consumer protection objective.

Defendant does not dispute that protecting consumers from deceptively packaged recordings within the context of commercial transactions is a legitimate public concern. Nor does he claim that the state has no interest in reducing record piracy by protecting consumers from unreliably packaged recordings. Instead, he contends that section 16—8 attempts to accomplish its goals in an irrational manner. Defendant believes that if the legislature wanted to penalize dealing in deceptively packaged recordings, it should have required, as an element of the statute, that the dealer act with a "fraudulent purpose." Moreover, the defendant argues that if section 16—8 is aimed at preventing record piracy, it should require a dealer to act "without the consent" of the recording's owner. Without either of these elements, defendant asserts, section 16—8 ensnares a substantial amount of "innocent" conduct. To support his position, defendant relies upon a line of cases from this court that have a common theme in that they struck down statutes on due process grounds because each of the statutes had the potential to sweep in innocent conduct that the legislature did not intend to criminalize. See *Carpenter*, 228 Ill. 2d 250; *Wright*, 194 Ill. 2d 1; *In re K.C.*, 186 Ill. 2d 542 (1999); *People v. Zaremba*, 158 Ill. 2d 36 (1994); *People v. Wick*, 107 Ill. 2d 62 (1985).

We believe, as the appellate court did, that the cases relied upon by defendant are distinguishable because in those cases the method adopted by the General Assembly captured conduct that was outside the set of criminal acts the General Assembly meant to punish. In contrast, the conduct that the General Assembly meant to penalize with section 16—8 appears to be the same as the activities actually captured by section 16—8.

In *Carpenter*, the statute at issue made it a felony to own or operate a vehicle knowing that it contains a false or secret compartment, where the compartment was intended and designed to conceal items from law enforcement. The purpose of the law was to protect police by punishing the use of a compartment to conceal weapons or contraband from police. But the problem was that the statute did not require the contents of the compartment to be illegal for a conviction to result. This court found that an intent to conceal something inside a vehicle does not necessarily involve illegal conduct, particularly since people often do—and sensibly so—conceal their worldly possessions from the general public, which includes, as a subset, law enforcement officers. *Carpenter*, 228 Ill. 2d at 269. In finding that the statute violated due process, this court stated that if the legislature wanted to punish those who conceal firearms or contraband in a false or secret compartment, "it would seem that the rational approach might have been to punish *** those who actually did that." *Carpenter*, 228 Ill. 2d at 273.

In *Wright*, this court addressed a statute that made it a felony to knowingly fail to maintain records relating to the acquisition and disposition of vehicles and parts. *Wright*, 194 Ill. 2d at 4. The purpose of the legislation was to combat the transfer or sale of stolen vehicles or parts. This court explained, however, that the statute penalized even minor lapses in record keeping attributable to innocent reasons, including disability and family

crises. *Wright*, 194 Ill. 2d at 28. Because the method used to combat transactions in stolen vehicles and parts broadly swept in, and irrationally penalized, innocent conduct unrelated to the statutes's purpose of dealing with stolen vehicles or parts, this court found that it failed the rational basis test. *Wright*, 194 Ill. 2d at 25, 28.

In *In re K.C.*, this court held that a provision of the Illinois Vehicle Code (625 ILCS 5/4—102(a) (West 1996)) unconstitutionally imposed absolute liability for a trespass to a vehicle. *In re K.C.*, 186 Ill. 2d at 552-53. The purpose of the law was to punish vandalism to motor vehicles. But because the statute did not demand a culpable mental state, it could punish the Good Samaritan who enters an unlocked car to turn off the headlights, or people who decorate a bride and groom's car, or get in a traffic accident, or inadvertently hit a baseball through a neighbor's windshield. This court concluded that the statute potentially punished wholly innocent conduct without requiring proof of a mental state and therefore could not stand. *In re K.C.*, 186 Ill. 2d at 553.

In *Zaremba*, this court invalidated legislation that defined theft as the knowing act of obtaining or exerting control over property in the custody of law enforcement that has been represented to have been stolen. *Zaremba*, 158 Ill. 2d at 39-40. The law was designed to facilitate fencing stings, but did not require that the person in control of the property be a part of the fencing operation, or otherwise act with an unlawful purpose. This court noted that without a provision requiring either that the control be unauthorized or that it be accompanied by an intent to deprive the rightful owner of permanent possession, the statute irrationally reached activities as innocent as "a police evidence technician who took from a police officer for safekeeping the proceeds of a theft." *Zaremba*, 158 Ill. 2d at 38. This court therefore concluded that the method employed by the statute to combat fenc-

ing operations—the activity the legislature intended to punish—unconstitutionally captured wholly innocent conduct unrelated to its purpose. *Zaremba*, 158 Ill. 2d at 42.

In *Wick*, this court considered a due process challenge to a portion of the aggravated arson statute that made it a Class X felony to use fire or explosives to knowingly damage property, thereby causing injury to a firefighter or police officer. The purpose of the statute was to punish *arsonists* more severely when their conduct results in personal injury to firemen or policemen than when it results in property damage alone. *Wick*, 107 Ill. 2d at 66. However, the unlawful purpose required for simple arson—that the offender knowingly damage by fire either the property of another without his consent, or any property with the intent to defraud an insurer—was not required for aggravated arson. This court explained that, by excluding the requirement of an unlawful purpose in setting a fire, the statute swept too broadly by including innocent as well as culpable conduct in setting fire. *Wick*, 107 Ill. 2d at 66. As an example, this court noted that a farmer who demolishes his deteriorated barn to clear space for a new one is liable for a Class X felony if a fireman standing by is injured at the scene. *Wick*, 107 Ill. 2d at 66. This court therefore held the method chosen by the legislature to combat arsonists swept too broadly because the set of activities penalized by the aggravated arson statute was much greater than the set of activities penalized by simple arson. *Wick*, 107 Ill. 2d at 66.

According to defendant, section 16—8 is no different from the statutes invalidated in *Carpenter*, *Wright*, *K.C.*, *Zaremba* and *Wick*. We disagree. Unlike the statutes in the cases relied upon by defendant, section 16—8 captures the precise activities that it was meant to punish. To accomplish its goal of protecting consumers, sec-

tion 16—8 sets out to punish all commercial dealings in unidentified sound or audiovisual recordings. These recordings are unidentified when their packaging does not disclose the name of the performer and the actual name and address of the manufacturer. The disclosures required are a rational means of implementing the legislative goal. The performer disclosure assures consumers that the sounds on the recording are the work of one performer and not another. The manufacturer disclosure in turn provides consumers with an accurate name and address to direct his complaints if the product is defective. The disclosure requirements also reasonably advance section 16—8's antipiracy objective because counterfeiters seldom disclose themselves as the manufacturer of their illegal products (see *Anderson*, 26 F.3d 100) and are prone to intentionally or inadvertently sell recordings that contain work from a different performer than the one advertised on the label (see *People v. M&R Records, Inc.*, 106 Misc. 2d 1052, 1057, 432 N.Y.S.2d 846, 849 (Sup. Ct. 1980)).

We agree with the appellate court that by statutory definition, no truly innocent conduct is ensnared by the method employed to accomplish the desired legislative objectives. See 376 Ill. App. 3d at 897. A culpable mental state beyond what section 16—8 requires is not needed because "by statutory definition those that deal in 'unidentified' recordings are necessarily engaged in acts that are criminal in nature; they are not engaged in wholly innocent conduct." 376 Ill. App. 3d at 897. If section 16—8 were to condition liability on the mental states that defendant contends are necessary, the statute would likely exclude many of the activities it is meant to punish. For example, adding a fraudulent purpose element could render section 16—8 underinclusive if it were read to exempt a counterfeiter who told the buyer that the recordings were counterfeit or sold them to the buyer

under inherently suspicious circumstances so that there could be no mistake on the part of the buyer but that the items were counterfeit.

Likewise, a consent element would not make section 16—8 any better and is not necessary to uphold its constitutionality. Narrowing section 16—8 to punish only dealings in unidentified recordings without the consent of the owner would adequately serve the statute's antipiracy interest, but it would largely defeat its primary consumer-protection interest. See *Anderson*, 26 F.3d at 103. Section 16—8 is designed to apply to authorized and unauthorized recordings alike. An authorized recording can be deceptively packaged or defective just as readily as an unauthorized recording, and it cannot be assumed that every authorized recording is necessarily manufactured and sold with the consumer's interest in mind. Moreover, it is not improper for a legislature to require that a recording—whether it is a legitimately authorized one or not—reliably disclose its performer and manufacturer to the consumer. See *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237-38, 11 L. Ed. 2d 669, 672, 84 S. Ct. 779, 782 (1964) (noting that a state may require that goods, patented or unpatented, be labeled or that other precautionary steps be taken to prevent consumers from being misled as to the source).

Defendant offers two hypothetical situations to illustrate the kind of conduct that he believes is unfairly proscribed by section 16—8. One is of an independent artist selling his own music on a street corner, who neglectfully fails to disclose himself as the performer and manufacturer on the packaging of the sound recording. The other is of a person who sells authorized copies of a sound recording on behalf of an artist, but where the copies omit the mandated disclosures because the artist may have wanted to conceal his identity.

The problem with both of defendant's hypotheticals is that even the conduct he proposes does not extend beyond the very conduct the legislature meant to punish. Section 16—8 applies to all unidentified recordings, and narrowing the statute to exclude the examples mentioned would defeat some aspect of the consumer protection the legislature seems to have intended. The legislature was free to determine that the examples cited would not be "innocent" conduct given the governmental interest in protecting consumers. Because the conduct posed by defendant's hypotheticals cannot be considered wholly innocent, it seems that defendant's argument boils down to the notion that the statute should be declared unconstitutional simply because some conduct that it proscribes would be less egregious than other types of conduct that could also constitute a violation under the same statute. But this is one of the reasons why the legislature has set sentencing ranges for offenses with an allowance for judicial discretion at sentencing.

Moreover, we note that approximately 45 states have labeling laws similar to section 16—8. See M. Coblenz, *Intellectual Property Crimes*, 9 Albany L.J. Sci. & Tech. 235, 269 n.165 (1999) (discussing state law efforts to protect consumers from mislabeled sound recordings). Yet none of these statutes has ever been struck down as unconstitutional on any ground.

Under the circumstances, we conclude that section 16—8 bears a reasonable relationship to the public interest to be served and that the means adopted are a sufficiently reasonable method to accomplish the desired objective. We therefore hold that defendant's prosecution under section 16—8 does not violate due process.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court.

*Appellate court judgment affirmed.*